**CARIBBEAN BROADCASTING SYSTEM, LTD. and Alvin L. Korngold, Appellants,**

v.

**CABLE & WIRELESS PLC, et al., Appellees.**

**No. 96–7246.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 5, 1997.

Decided July 17, 1998.

Whitney L. Ellenby argued the cause for appellants, with whom Robert A. Skitol and Philip J. Mause were on the briefs.

Theodore Case Whitehouse argued the cause for appellees and filed the brief for Cable & Wireless PLC, and Cable & Wireless (West Indies) Ltd.

Terrence J. Leahy filed the brief for appellee Caribbean Communications Company Limited.

Before: WILLIAMS, GINSBURG, and HENDERSON, Circuit Judges.

GINSBURG, Circuit Judge:

Caribbean Broadcasting System appeals the judgment of the district court dismissing its antitrust complaint against Cable & Wireless, Cable & Wireless (West Indies), and Caribbean Communications Company. We reverse in part and affirm in part.

## I. Background

Plaintiff CBS and defendant CCC own competing FM radio stations located in the Eastern Caribbean, which includes Puerto Rico and the Virgin Islands. Defendant C&W and its subsidiary C&W (West Indies), hereinafter jointly C&W, operate a worldwide telecommunications system and publish the local telephone directory in the Caribbean. During the mid–1980s C&W and CCC entered into a joint venture in which CCC was to develop a Caribbean-wide FM broadcasting system that C&W would then use to offer an FM paging service.

Beginning in 1984 CBS tried without success to sell advertising on its nascent FM broadcast station based in the British Virgin Islands. Attributing its failure to deception practiced by CCC and C&W as part of an attempt to gain and keep a monopoly for CCC's "Radio GEM," CBS sued them both in Florida state court. The defendants removed the case to a federal court, which dismissed it without prejudice; CBS appealed to the Eleventh Circuit, but later voluntarily dismissed the appeal and refiled its complaint in the United States District Court for the District of Columbia. CBS later sought and was granted leave to file a First Amended Complaint in order to correct a technical error in its description of the ownership of CBS.

The eleven counts of CBS's complaint fall into three basic categories. First, it charged that CCC, by falsely claiming that Radio GEM's signal reached the entire Eastern Caribbean, had led advertisers to believe they could fulfill their advertising needs by dealing only with Radio GEM, in violation of the prohibition of attempted and actual monopolization in the Sherman Act, see 15 U.S.C. §§ 1–2, and the prohibition of false representations in the Lanham Act, see 15 U.S.C. § 1125(a). Second, CBS charged that CCC had conspired with C&W to maintain CCC's monopoly over radio broadcast in the Eastern Caribbean, in violation of the Sherman Act. In furtherance of the conspiracy (still according to CBS), C&W had filed sham objections to CBS's application for a broadcast license, thereby delaying CBS's entry into broadcasting for more than two years. Third, CBS charged that C&W had violated the Sherman Act by denying it access to essential facilities; specifically, CBS alleged that C&W had persistently published an incorrect telephone listing for CBS and denied CBS access to its microwave transmitters in order to prevent CBS from reaching the entire Eastern Caribbean.

The district court dismissed the complaint in two stages. In its first opinion, dealing only with the claims against C&W, the court held that (1) it lacked subject matter jurisdiction over the claims of monopolization (in counts II–X) because "plaintiffs [did] not allege[ ] necessary facts to substantiate a claim of adverse effect on U.S. commerce arising out of Defendants' alleged misconduct"; and (2) CBS failed (in Count XI) to state a claim upon which relief could be granted because it did not "allege sufficient facts to establish that Defendants denied [CBS] use of an essential facility." *See Caribbean Broadcast System Ltd. v. Cable & Wireless PLC,* 1995 WL 767164 (D.D.C.1995). The court explained that the complaint "never identifies any facility to which CBS was denied access nor a single instance in which access to a facility was actually requested or denied," and fails to establish that C&W had ever been a competitor of CBS. CBS sought reconsideration or, in the alternative, leave to file a second amended complaint. The district court denied reconsideration, clarified that its dismissal of Counts II–XI was with prejudice, and denied as both "untimely" and "futile" CBS's request to file a second amended complaint.

In its second opinion the district court dismissed the Lanham Act claim (in Count I) for lack of personal jurisdiction over CCC. The court stated that because CBS

> fails to allege any connection whatsoever between CCC and the District of Columbia.... [it appears that] CCC does not possess sufficient, minimum contacts with [the District] to satisfy the due process requirements of the Constitution and comport with 'traditional notions of fair play and substantial justice.'

*Caribbean Broadcast System v. Cable and Wireless PLC,* C.A. No. 93–2050, slip op. at 4–5 (D.D.C. Oct. 17, 1996). The district court also denied CBS's request for jurisdictional discovery, for three reasons: CBS had "not offered a scintilla of evidence to suggest that CCC has even the slightest connection with the District of Columbia"; CBS "well kn[ew] that CCC has contacts with, and therefore could appropriately be sued in ... Wisconsin or the Virgin Islands"; and "it is

simply too late ... in the history of th[is] litigation ... to now allow Plaintiff to conduct the investigation."

CBS now argues that the district court erred in dismissing its complaint for lack of subject matter jurisdiction and failure to state a claim, in denying jurisdictional discovery against CCC, and in dismissing its Lanham Act claim against CCC with, rather than without, prejudice.

## II. Discussion

We hold first that the district court erred in denying CBS leave to file its proposed Second Amended Complaint, which properly alleged subject matter jurisdiction over the claims of monopolization. We agree with the district court, however, that CBS's complaint failed to allege that CCC and C&W had denied CBS the use of an essential facility. Finally, we hold that the district court did not abuse its discretion in denying jurisdictional discovery and did not dismiss the complaint against CCC with prejudice.

## A. Denial of Leave to Amend the Complaint

■ As noted, the district court early on granted CBS leave to file a First Amended Complaint correcting the description of CBS's ownership. After the district court dismissed Counts II–XI for lack of subject matter jurisdiction, CBS sought to make a second amendment—in order to clarify the jurisdictional allegations in its complaint—but the district court denied leave to amend on the grounds that such an amendment would be both untimely and futile. CBS contests both points. For its part, C&W argues that the district court ruled correctly because CBS had already failed "in five attempts encompassing this case and others" to file a proper complaint.

Federal Rule of Civil Procedure 15(a) provides that a party may amend its pleading once as a matter of course and thereafter by leave of court, which "leave shall be freely given when justice so requires." We have recently had occasion to point out that "it is an abuse of discretion to deny leave to amend [without giving a] sufficient reason." *Firestone v. Firestone,* 76 F.3d 1205, 1208 (1996)

(citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)); *see also Bank v. Pitt*, 928 F.2d 1108, 1112 (11th Cir. 1991) (noting that district court's discretion to dismiss without leave to amend is "severely restricted" by command of Rule 15(a) that such leave be "freely given"). In this case we conclude that neither of the reasons given by the district court is sufficient.

First, the amendment would not have been "futile" because, as explained below, the allegations of the second amended complaint support subject matter jurisdiction. Second, there is no indication that the amendment was in any cognizable way "untimely." The statute of limitations had not run, nor was there any prejudice to the defendants by reason of the timing. *See, e.g., Confederate Memorial Ass'n v. Hines*, 995 F.2d 295, 299 (D.C.Cir.1993) (noting that Fed.R.Civ.P. 15(a) gives court power to grant leave to amend complaint even after case is dismissed); 6 Charles Alan Wright Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure: Civil 2d § 1488, at 652, 659, 662–69 (1990 & Supp.1997) ("Rule 15(a) does not prescribe any time limit within which a party may apply to the court for leave to amend.... In most cases delay alone is not a sufficient reason for denying leave.... If no prejudice [to the non-moving party] is found, the amendment will be allowed").

■■■ C&W makes much of the district court's statement that it was denying CBS leave to amend in view of the "entire lengthy record herein," but C&W's argument is not entirely clear. C&W could be arguing that the district court's mention of having considered the "entire lengthy record" indicates that the court, in concluding that amendment would be both untimely and futile, relied in part upon the overall history of the dispute, including the case CBS had previously initiated in Florida. Whether the court meant to encompass that history within the reason for its decision is not clear, however; the "lengthy record" in question may well refer only to the present litigation, which alone had been going on for more than three years at the time. In either event, the district court erred; the prolonged nature of a case does not itself affect whether the plaintiff may amend its complaint. *See, e.g., Security Ins. Co. of Hartford v. Kevin Tucker & Assoc., Inc.*, 64 F.3d 1001 (6th Cir.1995) (holding district court abused discretion in denying leave to amend complaint to add claim when party opposing motion made no showing of prejudice from delay); *Buder v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 644 F.2d 690 (8th Cir.1981) (holding district court abused discretion in denying leave to amend complaint to add count when no prejudice resulted from two and one-half year delay and facts underlying new and old counts were similar). The length of a litigation is relevant only insofar as it suggests either bad faith on the part of the moving party or potential prejudice to the non-moving party should an amendment be allowed, *see* 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, § 1487 (1990 & Supp.1997); here the district court never intimated a concern either with bad faith or with prejudice.

Alternatively, C&W might be arguing that the district court's reference to the "entire lengthy record" is an allusion to our suggestion in *Firestone*, following *Foman*, 371 U.S. at 182, 83 S.Ct. 227, that a plaintiff's failure to cure a defect in its complaint after repeated amendments is at some point sufficient to warrant denying it leave to amend yet again. But we will not infer such an acute point from such an oblique reference— if it is a reference at all—particularly in light of the policy in favor of hearing cases on their merits. *See, e.g., Poloron Prods., Inc. v. Lybrand Ross Bros. & Montgomery*, 72 F.R.D. 556, 561 (S.D.N.Y.1976) (holding plaintiff's five previous attempts to state cognizable claim did not preclude amendment, because Federal Rules suggest "artless drafting of a complaint should not allow for the artful dodging of a claim"); *Rosen v. TRW, Inc.*, 979 F.2d 191, 194 (11th Cir.1992) (citing doctrine that "leave to amend is particularly appropriate following dismissal of a complaint for failure to state a claim"); *see also Conley v. Gibson*, 355 U.S. 41, 48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) ("The Federal Rules ... accept the principle that the purpose of pleading is to facilitate a proper decision on the merits").

Because the reasons given by the district court did not justify denying the plaintiff leave to amend its complaint, we reverse the district court. To remand this case for the district court to consider the Second Amended Complaint would be a waste of judicial resources, however. In deciding that to amend the complaint would be futile, the district court acted in the belief that the fault it found with the First Amended Complaint—namely, that it did not allege an adverse effect upon the commerce of the United States sufficient to support subject matter jurisdiction over Counts II–XI [see JA at 129–131]—was not addressed by anything in the Second Amended Complaint, which more clearly alleged an effect upon U.S. commerce. In effect, then, the district court has already expressed its view that the Second Amended Complaint fails to show that it has subject matter jurisdiction (although it erred in so doing, as the next section explains).

## B. Subject Matter Jurisdiction over Counts II–XI

■ With the Second Amended Complaint before us, then, we turn to CBS's argument that it made allegations sufficient to support subject matter jurisdiction. C&W argues in response that the complaint does not adequately allege either a harmful effect upon U.S. commerce or a relevant market, and that in any event it does not provide facts to support the allegations made. In our review of the complaint, which is *de novo*, we assume the truth of the allegations made and construe them favorably to the plaintiff. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

CBS asserts that the district court has jurisdiction under the Sherman Act, *see* 15 U.S.C. § 1–2, and the Foreign Trade Antitrust Improvements Act of 1982, *see* 15 U.S.C. § 6a. Although the Sherman Act prohibits monopolization and attempted monopolization of any line of interstate or foreign commerce, section 1 of the FTAIA makes the Sherman Act inapplicable to

conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—

(1) such conduct has a direct, substantial, and reasonably foreseeable effect—

(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States.

15 U.S.C. § 6a. A proviso establishes that if the FTAIA applies to conduct involving foreign trade based solely upon clause (B) quoted above, then the offender is subject to the Sherman Act "only for injury to export business in the United States." *Id.*

■ When a plaintiff brings a claim of attempted monopolization or conspiracy to monopolize in a market involving foreign trade, therefore, a court has subject matter jurisdiction only to the extent that the complaint alleges that the challenged conduct had a " 'direct, substantial, and reasonably foreseeable effect' on domestic or import commerce, or the export opportunities of a domestic person" (as required by the FTAIA). H.R.Rep. No. 97–686, at 3 (1982), U.S. Code Cong. & Admin. News at 2487, 2488. The precise effect of the FTAIA is yet to be determined. *See Hartford Fire Insurance Co. v. California*, 509 U.S. 764, 797 & n. 23, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) (It is "unclear ... whether the [FTAIA's] 'direct, substantial, and reasonably foreseeable effect' standard amends ... or merely codifies ... [caselaw holding that the Sherman Act] applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States"). It does seem clear, however, that we should use the standard set forth in the FTAIA to analyze whether conduct related to international trade has had an effect of the nature and magnitude necessary to provide us with subject matter jurisdiction. *See* H.R.Rep. No. 97–686, at 5. The complaint meets this standard.

■ For convenience we discuss first C&W's argument that CBS failed to allege specific facts to support the court's jurisdiction over CBS's claims. In the notice pleading system established by Federal Rule of

Civil Procedure 8, all that is required is a " 'short and plain statement of the claim' that will give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests." *Sinclair v. Kleindienst*, 711 F.2d 291, 293 (D.C.Cir.1983). A complaint satisfies this criterion if it is not "so vague or ambiguous that a party cannot reasonably be expected to frame a responsive pleading." F.R.Civ.P. 12(e). In other words, a plaintiff need not allege all the facts necessary to prove its claim so long as it provides enough factual information to make clear the substance of that claim. *See Atchinson v. District of Columbia*, 73 F.3d 418, 421–22 (1996).

■ Because a plaintiff is not required to plead facts sufficient to prove its allegations, a federal court should not dismiss a complaint either for lack of subject matter jurisdiction or for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Kleindienst*, 711 F.2d at 293 (quoting *Conley v. Gibson*, 355 U.S. at 45–46, 78 S.Ct. 99). After all, the issue presented by a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. at 236, 94 S.Ct. 1683.

■ The complaint filed by CBS is sufficient to survive a motion to dismiss, therefore, so long as it makes allegations that, if proven, would show that the challenged conduct had a "direct, substantial, and reasonably foreseeable effect" upon an aspect of commerce to which the Sherman Act, as qualified by the FTAIA, applies. The complaint does make such allegations. First, CBS alleges (¶¶ 9–14) that there is a significant market for the sale of English-language radio advertising in the Eastern Caribbean, which includes Puerto Rico and the U.S. Virgin Islands. CBS also alleges (¶¶ 9, 15–19, 48A) that many companies based in the United States are customers, and that CCC and CBS are competing sellers, in that market. Finally, CBS alleges (¶¶ 20–26) that there are substantial barriers to entry into the market: both a broadcast license and a large capital investment are necessary; in

addition, CCC has "locked up" the available advertising contracts. Under the circumstances it is quite plausible that the plaintiffs' alleged conduct would have a significant effect upon U.S. commerce.

CCC argues that because CBS is "merely [a] foreign supplier[ ]" it cannot establish the court's jurisdiction by " 'piggy-back[ing]' on the alleged injury to U.S. purchasers of media advertising." CCC relies upon a district court holding that a foreign company had to show injury within the United States before the court would have subject matter jurisdiction under the Sherman Act, and that such a company could not do so merely by showing injury to an unrelated American firm. *See The 'In' Porters, S.A. v. Hanes Printables, Inc.*, 663 F.Supp. 494 (M.D.N.C.1987). Even if we were bound by that court's holding, we would not think the case pertinent here because the foreign firm in that case did not sell to American consumers; rather, it attempted to show that the injury it incurred abroad ultimately injured American exporters, from which it purchased fewer goods for resale overseas. The district court held that, because the plaintiff's claimed injury was not an "injury to export business in the United States" within the meaning of the proviso to the FTAIA, the foreign firm did not have standing. Here, however, the alleged injury is to advertisers in the United States. Consequently, clause 1(A) rather than clause 1(B) of the FTAIA governs, and the location of the suppliers is not relevant to whether the plaintiff has alleged an effect upon U.S. domestic or import commerce. *See Hartford*, 509 U.S. at 796, 113 S.Ct. 2891 (holding court had subject matter jurisdiction where plaintiff alleged conspiracy among foreign reinsurance companies had affected U.S. purchasers of reinsurance).

■ We now turn to C&W's primary argument, namely, that the complaint fails to allege either harm to U.S. commerce or a relevant market. We find neither part of this argument persuasive. The complaint both describes a relevant market—the market for English-language radio broadcast advertising in the Eastern Caribbean—and alleges that CCC and C&W engaged in intentional conduct that gave them "monopoly

power" and injured consumers in this market. (¶¶ 12–14) According to CBS, CCC and C&W misrepresented to advertisers that they could reach the "entire Caribbean" over CCC's station—which in fact reached only a fraction of that area—and therefore that they did not need to advertise with CBS as well. (¶¶ 30–34) The complaint also alleges that CCC and C&W made sham technical objections to CBS's application for a broadcast license for the purpose of defeating that application and thereby ensuring that CCC would continue to enjoy a monopoly. (¶¶ 35–40)

Contrary to the arguments of C&W, such allegations do support the district court's subject matter jurisdiction. A would-be monopolist or member of a conspiracy to monopolize comes within the condemnation of the Sherman Act when it engages in "anticompetitive conduct." *See, e.g., Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993) (holding elements of attempted monopolization claim under § 2 of Sherman Act are intent, anticompetitive conduct, and dangerous probability of success in a relevant market). "Anticompetitive conduct" can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties. It is a fair inference from the case law, however, that the allegations made here—namely, that the defendants made fraudulent misrepresentations to advertisers and sham objections to a government licensing agency in order to protect their monopoly—bring the defendants' conduct well within that concept. *See, e.g., California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) (holding that complaint alleging conspiracy to misuse state legal and regulatory processes in order to deprive competitors of meaningful access stated claim under Clayton Act); *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247, (1965) (holding that complaint alleging defendant attempted to monopolize by threatening to and pursuing legal enforcement of patent procured by fraud on Patent Office stated claim under § 2 of Sherman Act).

Moreover, the complaint alleges specifically that U.S. customers in the relevant market suffered antitrust injury, to wit, they paid excessive prices for advertising because of the unlawful actions of CCC and C&W. (¶ 48A) It also alleges that CBS was and remains foreclosed from selling advertising to many of those U.S. companies that had purchased advertising time from CCC. (¶ 47)

Paying higher prices is certainly a direct harm to customers. The allegations that CBS was delayed in obtaining its broadcast license and was foreclosed from soliciting many potential advertisers also describe actual, albeit indirect, harms to customers. In this context it appears that antitrust injury to CBS is ultimately a harm to U.S. purchasers of radio advertising. By keeping CBS out of the market, CCC and C&W denied such purchasers the benefit of competition.

Construing the complaint liberally, then, we understand it to say that CCC and C&W intentionally and successfully, by means of fraud and deceit, secured monopoly power in the relevant market, used this power to raise prices, and thereby hurt U.S. advertisers. Indeed, C&W virtually admits that CBS's complaint alleges antitrust injury when it argues that "CBS described markets so narrowly configured that any commercial harm to CBS [is], *ipso facto,* harm to competition" in those markets and hence has a substantial effect upon U.S. commerce. Be that as it may, we hold that CBS made sufficient allegations to support the subject matter jurisdiction of the district court.

## C. The Essential Facilities Claim: Count XI

 C&W owned microwave facilities described by CBS as "unique" in the Eastern Caribbean (¶ 42) and published the only telephone directory in the British Virgin Islands. (¶ 41) C&W also owned a 27% stake in CCC's radio station and was planning a joint venture with CCC to provide paging services. CBS alleged that C & W denied CBS access to its microwave facilities and directory, and that both such facilities were essential for it to compete with CCC's Radio GEM.

A monopolist has no general duty to share his essential facility, although there are certain circumstances in which he must do so. *See* Philip E. Areeda & Herbert Hovenkamp, Antitrust Law 815–864 (1992 Supp.) (proposing narrow interpretation of essential facilities doctrine). In the special circumstances where there may be such an obligation, the elements of an antitrust claim for denial of access to an essential facility are (1) a monopolist who competes with the plaintiff controls an essential facility, (2) the plaintiff cannot duplicate that facility, (3) the monopolist denied the plaintiffs use of the facility, and (4) the monopolist could feasibly have granted the plaintiff use of the facility. *See MCI Communications Corp. v. AT&T,* 708 F.2d 1081, 1132–33 (7th Cir.1983); Philip Areeda, *Essential Facilities: An Epithet in Need of Limiting Principles,* 58 Antitrust L.J. 841, 853 n.21 (1989) (noting that *"MCI Communications* ... is probably correct [in holding that] a monopolist must, when feasible, make its essential facility available to a competitor who is unable to duplicate it"). Because the appellees have not argued to the contrary, we assume that the essential facilities doctrine is applicable to their circumstances.

The district court held that CBS had failed adequately to allege an essential facilities claim for two reasons: first, CBS did not allege that it competed with C&W, and second, CBS did not allege any specific instance in which C&W had denied CBS access to a particular facility. We uphold the district court on the former ground and therefore do not reach the latter.

CCC does not dispute that it competed with CBS, but because—as the district court held and we affirm—the court does not have personal jurisdiction over CCC, *see* Part II.D below, the allegations against that company cannot support the essential facilities claim. As for C&W, the district court held that its 27% ownership interest in CCC did not make C&W itself a competitor of CBS. CBS argues that whether the parties are "in fact" competitors should not have been resolved on a motion to dismiss the complaint, which "alleged that C&W acted for the benefit of CCC in denying plaintiffs access to their

microwave and long-distance facilities." According to CBS, "C&W's equity interest in CCC and its corresponding financial stake in the exclusive provision of broadcasting services by CCC .... raise a factual issue as to whether C&W and plaintiffs [are] competitors." C&W counters that CBS alleges no facts even hinting that C&W might itself be a competitor of CBS except for C&W's 27% investment in CCC, and that as a matter of law such an investment alone cannot vicariously make C&W a competitor of CBS's.

As the district court recognized, one company's minority ownership interest in another company is not sufficient by itself to make the owner a competitor, for purposes of the antitrust laws, of the subsidiary's rivals. To be a competitor at the level of the subsidiary, the parent must have substantial control over the affairs and policies of the subsidiary. *See, e.g., Kennecott Copper Corp. v. Curtiss–Wright Corp.,* 584 F.2d 1195, 1205 (2d Cir.1978) (finding no violation of § 8 of Clayton Act where interlocked parent corporations had competing subsidiaries, but reserving issue whether statute would cover "parent corporation that closely controls and dictates the policies of its subsidiary"); *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.,* 658 F.Supp. 1061, 1084–85 (D.Del.1987) (holding that parent is liable for acts of subsidiary under agency theory only if parent "dominates" subsidiary; parent of wholly-owned subsidiary that had seats on board, took part in financing, and approved major policy decisions was not liable because parent did not have day-to-day control); *J.E. Rhoads & Sons, Inc. v. Ammeraal, Inc.,* 1988 WL 32012 (Del.Super.1988) (citing cases holding day-to-day control required before court will pierce corporate veil or find parent liable); *Outokumpu Engineering Enterprises, Inc. v. Kvaerner Enviropower, Inc.,* 685 A.2d 724, 729 n. 21 (Del.Super.1996) (noting test for parent's liability for act of subsidiary is whether parent had "exclusive domination and control to the point that the subsidiary no longer has legal or independent significance of its own"); *cf. Tiger Trash v. Browning–Ferris Indus., Inc.,* 560 F.2d 818 (7th Cir.1977) (holding that in order to prevent parent from carrying out anticompetitive activity through subsidiary, test for venue is

whether parent's control over subsidiary caused parent to "transact business" in state within venue provision of Clayton Act); *Phone Directories Co. v. Contel Corp.,* 786 F.Supp. 930 (D.Utah 1992) (test for venue under Clayton Act is whether parent had sufficient control to influence and control acts of subsidiary of type that might violate antitrust laws); *cf. also United States v. USX Corp.,* 68 F.3d 811, 823 n. 23 (3d Cir.1995) (citing cases holding, variously, that parent is liable under CERCLA for actions of a subsidiary or controlled company when parent has actual and pervasive control or, at least, authority to control subsidiary's decisions leading to CERCLA violation.)

CBS does not allege that C&W had such control. The complaint states only that C&W and CCC were involved in a "joint project"; they had "engaged in discussions and negotiations regarding their planned relationship"; and "a C&W representative was a member of CCC's Board of Directors." (¶ 44) Only the last point indicates that C&W had any influence in the affairs of CCC, and even it does not suggest the type of day-to-day control we think necessary to identify an investor so closely with the company in which it has invested as to make it a competitor of that company's rivals.

In sum, CBS does not allege that C&W had substantial control over CCC. Therefore, Count XI of the complaint fails to state a claim against C&W for denial of access to an essential facility.

## D. Jurisdictional Discovery and Dismissal with Prejudice

CBS's last two points on appeal go to rulings of the district court relevant only to CBS's action against CCC. CBS asserts that the district court erroneously denied CBS's request for jurisdictional discovery and dismissed its claim with rather than without prejudice.

### 1. Jurisdictional discovery

CBS argues that the district court abused its discretion in dismissing its case against CCC for lack of personal jurisdiction without giving CBS an opportunity to discover evidence that would support such jurisdic-

tion. *See, e.g., El–Fadl v. Central Bank of Jordan,* 75 F.3d 668, 675–76 (D.C.Cir.1996). CCC defends the district court's denial of discovery on the ground that CBS had failed to dispute CCC's affidavit that it did not solicit business in the District of Columbia and had never made any telephone calls into the District. Because there was no indication before the court that CCC had any contacts at all with the District of Columbia, let alone the minimum contacts necessary for the court, consonant with due process, to exercise personal jurisdiction over it, CCC argues that any discovery would have been inappropriate.

We hold that the district court did not abuse its discretion in denying CBS jurisdictional discovery. The District's long-arm statute is as far-reaching as due process allows, *see Hummel v. Koehler,* 458 A.2d 1187, 1190 (D.C.App.1983), meaning that only minimum contacts with the District are necessary to sustain jurisdiction here. *See International Shoe Co. v. State of Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); 4 Wright & Miller, § 1067–1067.1 (1988 & Supp.1997). CBS, however, has alleged absolutely nothing, upon either information or belief, to indicate that a court in the District of Columbia might constitutionally assert jurisdiction over CCC, which is incorporated in Montserrat, British West Indies, and has its U.S. operations in Wisconsin. The closest the complaint comes is to say that "CCC sells ... advertising time, primarily to U.S. companies," and that CCC "made sales calls to U.S. companies nationally" and "disseminated ... brochures by hand and by the U.S. mail." (¶¶ 8, 33) At the oral argument of this appeal counsel for CBS represented that CCC sold advertising to more than 500 companies and argued that the odds were therefore good that it had solicited at least one company located in the District; but CBS did not make even this cursory (and by no means self-evident) allegation before the district court. These statements are too bare to support even the inference that CCC solicited any companies located in the District of Columbia, much less that it actually did any business in the District—and minimal solicitation does not

generally support jurisdiction anyway. *See Volkswagen De Mexico v. Germanischer Lloyd,* 768 F.Supp. 1023 (S.D.N.Y.1991) (solicitation of business through advertisements in publications distributed in district does not support jurisdiction under N.Y. long-arm statute); *see also Gatewood v. Fiat, S.p.A.,* 617 F.2d 820 (D.C.Cir.1980) (solicitation of business must be "regular" in order to support jurisdiction); *McFarlane v. Esquire Magazine,* 74 F.3d 1296 (D.C.Cir.1996) (writing article for national publication obtainable in D.C. did not subject writer to personal jurisdiction in District). *But see United States Golf Ass'n v. U.S. Amateur Golf Ass'n,* 690 F.Supp. 317 (D.C.N.J.1988) (direct mail solicitation in New Jersey confers personal jurisdiction). In light of CCC's uncontested affidavit, therefore, the court was justified in denying further discovery.

CBS argues that it could not have made more specific allegations without jurisdictional discovery and that it never had the opportunity to take such discovery. Further, CBS points to cases in this circuit suggesting that a district court abuses its discretion when it dismisses a case for lack of personal jurisdiction before the plaintiff has had an opportunity for jurisdictional discovery. *See, e.g., Edmond v. United States Postal Serv. Gen. Counsel,* 949 F.2d 415 (D.C.Cir.1991). As CCC rejoins, however, in order to get jurisdictional discovery a plaintiff must have at least a good faith belief that such discovery will enable it to show that the court has personal jurisdiction over the defendant. *See, e.g., Hansen v. Neumueller GmbH,* 163 F.R.D. 471, 476 (D.Del.1995) (concluding, after analysis of Rules 26 and 8, that plaintiff who responded to defendant's affidavit with "a complete absence of jurisdictional facts" had not made threshold showing necessary to get jurisdictional discovery); *Poe v. Babcock Int'l, plc,* 662 F.Supp. 4, 7 (M.D.Pa.1985) (holding that because "plaintiff has met defendants' affidavit evidence with mere speculation, plaintiff's request for ... [jurisdictional] discovery ... must be denied"); *see also Ellis v. Fortune Seas, Ltd.,* 175 F.R.D. 308, 312 (S.D.Ind.1997) (citing cases and holding "it is reasonable for a court ... to expect the plaintiff to show a colorable basis for jurisdiction before subjecting the defendant to intru-

sive and burdensome discovery"); *International Terminal Operating Co., Inc., v. Skibs A/S Hidlefjord,* 63 F.R.D. 85 (S.D.N.Y.1973) (holding jurisdictional discovery not appropriate when plaintiff merely hopes to find statements in defendant's affidavit not accurate but has not made counter-allegations in its own affidavit).

To be sure, CBS had no obligation to make specific allegations relevant to personal jurisdiction in its complaint because lack of personal jurisdiction is an affirmative defense and so must be raised by the defendant. *See Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 704, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982); Fed.R.Civ.P. 12(b)(2). CBS's obligation to make some allegations relating to personal jurisdiction arose, therefore, only after CCC had filed its motion to dismiss and supporting affidavit. Even in its response to that motion, however, CBS did not allege any facts remotely suggesting that CCC had any connection to the District of Columbia.

On appeal CBS belatedly offers two facts that it claims support the inference that the district court has personal jurisdiction over the defendant: CCC advertises in *Caribbean Week,* "a publication which has Washington, D.C. subscribers," and maintains a Web site accessible to residents of the District (as well as the rest of the world, we assume). Although these facts were not timely pled, CBS argues that the court should take cognizance of them precisely because CBS did not have the benefit of jurisdictional discovery. To do so, however, would be to retry the case upon appeal and then to fault the district court for reaching a different result based upon the different allegations before it. Good order and common sense protest. Therefore, without intimating anything about the legal significance, if any, of CBS's belated factual proffer, we conclude that the district court did not abuse its discretion when it dismissed CBS's claim against CCC without first granting CBS's request for jurisdictional discovery.

**2. Dismissal of Count I with prejudice**

■ Although the district court did not state whether its dismissal of Count I (for

lack of personal jurisdiction over CCC) was with or without prejudice, both parties assume on appeal that, like the court's earlier dismissal of Counts II–XI, it was with prejudice. CBS sees this as an abuse of discretion; CCC denies the same. Neither party is correct because their shared assumption is mistaken.

While an involuntary dismissal ordinarily "operates as an adjudication upon the merits" unless the court "otherwise specifies," a dismissal for lack of jurisdiction is specifically exempted from this general rule. Fed. R.Civ.P. 41(b); *see also* Wright & Miller, § 2373 at 406 (1995) (noting that "dismissals that do not reach the merits because of a lack of jurisdiction ... must be considered to be without prejudice"); *Costello v. United States*, 365 U.S. 265, 285, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961) (noting that Rule 41(b) provides that dismissal is adjudication on merits unless for lack of personal jurisdiction, among other reasons). In rare circumstances, a district court may use its inherent power to dismiss with prejudice (as a sanction for misconduct) even a case over which it lacks jurisdiction, and its decision to do so is reviewed for abuse of discretion. *See* 9 Wright & Miller, § 2369 (1995 & Supp.1997). We cannot infer from the district court's mere silence, however, that it intended to impose such a drastic sanction; nor did the district court advert to any misconduct for which it might have intended such a sanction. We therefore conclude that dismissal of Count I of the complaint was without prejudice.

### III. Conclusion

The district court erred in dismissing Counts II–XI (the attempted monopolization claims) for lack of subject matter jurisdiction, but correctly dismissed Count XI (the essential facilities claim) for failure to state a claim and Count I (the Lanham Act claim) for lack of personal jurisdiction over CCC. The district court did not abuse its discretion in denying jurisdictional discovery before dismissing Count I, which it did without prejudice. The case is remanded to the district court for further proceedings consistent with this opinion.

*So ordered.*