## In re AUCTION HOUSES ANTITRUST LITIGATION.

### No. 00CIV.0648(LAK).

United States District Court,
S.D. New York.

April 20, 2000.

Steven Alan Reiss, Howard B. Comet, Edward J. Burke, Weil, Gotshal & Manges LLP, for Defendants Sotheby's Holdings, Inc. and Sotheby's, Inc.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Plaintiffs in these consolidated class actions seek damages and other relief for alleged price fixing in violation of the antitrust laws. The matter is before the Court on plaintiffs' motion to certify a plaintiff class.

### Facts

Except as otherwise noted, the following discussion assumes the truth of the allegations of the complaint.[1] It is not to be construed as containing findings of fact with respect to plaintiffs' substantive allegations.

Defendants Sotheby's Holding, Inc. and its subsidiary Sotheby's Inc. (collectively "Sotheby's") and Christie's International PLC and its subsidiary Christie's, Inc. (collectively "Christie's") are in the business of providing auction services of fine and applied arts, furniture, antiques, automobiles, collectibles and other items. Plaintiffs allege that they dominate the market for such services in the United States.

The primary sources of revenues of the defendant auction houses are so-called buyers' premiums and seller's commissions. A buyer's premium is, typically, a percentage of the price at which the buyer successfully bids on an item at auction which is added to the auction sales price and retained by the auction house. The seller's commission is a percentage of the auction sales price deducted from the sale proceeds paid to the seller and retained by the auction house. Thus, if an auction house charges a 5 percent seller's commission and a 5 percent buyer's commission on an article sold at auction for $1,000, the buyer pays the auction house $1,050 (the $1,000 bid price plus a $50 buyer's premium), while the auction house pays the seller $950 (the $1,000 bid price less a $50 seller's commission).

Frederick P. Furth, Stanley M. Grossman, Michael D. Hausfeld, Robert N. Kaplan, Christopher Lovell, Robert A. Skirnick, Interim Lead Counsel for Plaintiffs.

Michael L. Weiner, Christopher H. Aronson, John A. Donovan, Skadden, Arps, Slate, Meagher & Flom, LLP, for Defendants Christie's International plc and Christie's, Inc.

---

1. *See, e.g., German v. Federal Home Loan Mortgage Corp.,* 885 F.Supp. 537, 547 (S.D.N.Y.1995); *Maywalt v. Parker & Parsley Petroleum Co.,* 147 F.R.D. 51, 54 (S.D.N.Y.1993).

Plaintiffs allege that the auction house defendants, beginning at least as early as January 1, 1993, conspired to manipulate the prices at which they provided non-internet auction services. The conspiracy allegedly began in 1993 with an agreement to employ a common rate schedule for the premiums charged to buyers. It allegedly was expanded in 1995, when they allegedly agreed to use substantially similar rates for sellers' commissions. Further, plaintiffs maintain that the auction houses agreed in 1995 to terminate the previous practice of negotiating the amounts of sellers' commissions with some of their customers.

On December 24, 1999, Christie's International's former chief executive officer, Christopher Davidge, resigned abruptly. Subsequently, Christie's reportedly provided evidence of price fixing with Sotheby's to the Department of Justice and is said to have received conditional amnesty from criminal prosecution in exchange for providing evidence. These actions were commenced following press reports of these events.

### Discussion

Plaintiffs seek to bring this action on behalf of all persons who purchased from or sold through defendants items offered at or sold through defendants' non-internet auctions held in the United States between January 1, 1993 and February 7, 2000. They seek certification under both Rules 23(b)(2) and 23(b)(3). Sotheby's does not oppose plaintiffs' motion for class certification, although it contends that some factual components of these actions are not amenable to class action treatment. Christie's, in contrast, opposes class certification, arguing that Rule 23(b)(2) certification is inappropriate in what is primarily a damages case and that the alleged predominance of individual issues precludes certification under Rule 23(b)(3).

### Rule 23(a)

Rule 23(a) establishes four prerequisites to class certification. The class must be so numerous that joinder of all members is impracticable. There must be questions of law or fact common to the class. The claims or defenses of the class representatives must be typical of the claims or defenses of the class. And the representative parties must fairly and adequately protect the interests of the class. While no one disputes that these requirements all are satisfied, the Court has an independent obligation to ensure that this is so.

■ There is no evidence as to precisely, or even approximately, how many persons bought or sold articles through the defendant auction houses during the relevant period. Given the duration of the alleged conspiracy and the scope of defendants' activities, however, it is inconceivable that all class members could be joined. Indeed, the number of named plaintiffs in these consolidated class actions arguably is alone sufficiently numerous to justify class action treatment.[2] Moreover, the strong likelihood is that the class numbers in the thousands if not tens of thousands. The numerosity requirement is satisfied.

■ The existence of common questions of law or fact—not least of them the existence and scope of the alleged conspiracy—is obvious. The issues of the existence and scope of a price fixing conspiracy frequently have been held to satisfy the requirement of common questions.[3]

■ The typicality requirement refers to: "the nature of the claim of the class representatives, and not to the specific facts from which the claim arose or relief is sought. The proper inquiry is whether other members of the class have the same or similar injury, whether the action is based on conduct not special or unique to the named plaintiffs, and whether other class

---

**2.** While most class actions have involved larger numbers, classes as small as 35 or 36 members have been held to satisfy the numerosity requirement. *E.g., Fidelis Corp. v. Litton Industries, Inc.,* 293 F.Supp. 164, 170 (S.D.N.Y.1968) (35 to 70); *Town of New Castle v. Yonkers Contracting Co.,* 131 F.R.D. 38, 41 (S.D.N.Y.1990) (36).

**3.** *See, e.g., In re NASDAQ Market–Makers Antitrust Litig.,* 169 F.R.D. 493, 509 (S.D.N.Y.1996).

members have been injured by the same course of conduct."[4]

Moreover, the "primary criterion [for determining typicality] is the forthrightness and vigor with which the representative party can be expected to assert the interests of the members of the class."[5] In view of the fact that plaintiffs' claims are based on the same legal theories and factual allegations as those of the putative class members, the typicality requirement is satisfied.[6]

■ The adequacy of representation requirement focuses on whether the plaintiffs have interests antagonistic to those of other class members and whether plaintiffs and their counsel are capable of competently and vigorously prosecuting the litigation.[7] Both buyers and sellers who have used defendants' services allegedly have been impacted by the artificial inflation of both buyers' and sellers' commissions pursuant to the conspiracy. Any distinctions between the two groups are of no moment at this stage of the litigation and pose no bar to class certification.[8] Certainly the interim lead counsel and their clients are capable of pursuing the litigation in an appropriate manner. Accordingly, the Court finds that plaintiffs are adequate representatives of the alleged class.

*Rule 23(b)(2)*

■ Assuming that a putative class action satisfies the requirements of Rule 23(a), it nevertheless may not be certified unless one of the mandates of Rule 23(b) is met. Plaintiffs maintain that the defendants have acted toward the class members on grounds generally applicable to the class, thus making declaratory or injunctive relief appropriate and satisfying Rule 23(b)(2).

Rule 23(b)(2) "was never intended to cover cases ... where the primary claim is for damages, but is only applicable where the relief sought is exclusively or predominantly injunctive or declaratory."[9] There simply is no denying that the predominant relief sought here is damages.[10]

The Court declines to certify the putative class under Rule 23(b)(2).

*Rule 23(b)(3)*

■ Certification under Rule 23(b)(3) requires findings "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."[11]

*Predominance*

In order to recover in this case, plaintiffs will have to prove the existence of the alleged price-fixing conspiracy, that the members of the class were injured in their business or property by reason of that conspiracy (the "impact" question), and the amount of their

---

4. *Dura–Bilt Corp. v. Chase Manhattan Bank*, 89 F.R.D. 87, 99 (S.D.N.Y.1981).

5. *Nat'l Auto Brokers Corp. v. General Motors Corp.*, 60 F.R.D. 476, 486–87 (S.D.N.Y.1973).

6. *See, e.g., In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir.1992), *cert. dismissed sub nom. Hart Holding Co. v. Drexel Burnham Lambert Group, Inc.*, 506 U.S. 1088, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993).

7. *See General Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

8. *See, e.g., NASDAQ*, 169 F.R.D. at 513–14.

9. *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 564 (2d Cir.1968), *accord, Goldberg v. Winston & Morrone, P.C.*, No. 95 Civ. 9282(LAK), 1997 WL 139526, *4 (S.D.N.Y. Mar.26, 1997).

10. Moreover, the plaintiffs allege that Christie's on February 7, 2000 announced changes in its commission and premium schedules in order to "diminish or end its liability under Section 1 of the Sherman Act by enabling itself to argue that it had withdrawn from the unlawful contract, combination and conspiracy." Second Amended Complaint ¶¶ 51–52; *see also id.* ¶¶ 54–55 (alleging same as to Sotheby's). Thus, there is little reason to suppose that plaintiffs have stated a legally sufficient claim for injunctive or declaratory relief, although the Court does not rely on this point in view of the inappropriateness of considering the merits in making class determinations. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

11. FED. R. CIV. P. 23(b)(3).

damages.[12]  All agree that the nature, existence and duration of the alleged conspiracy is a question common to the entire class.

Christie's and, although it does not oppose class certification, Sotheby's argue that the impact issue will require individualized proof by particular class members and that these individual questions predominate over the common questions as to the nature and existence of the conspiracy.  Sotheby's suggests also that the amount of damages will have to be determined on an individual basis.

### 1. Impact

Defendants make a number of factual contentions in support of their assertion that impact will have to be determined on an individual basis.  They point to the fact that the 1995 schedule of sellers' commissions lowered the stated rates, that it permitted sellers to aggregate their sales over time to get lower rates, and that the defendants "cheated" to some extent on the alleged unlawful agreement by undercutting the agreed commissions to certain customers.  In addition, they assert that the central or even essential basis for plaintiffs' allegations regarding the 1995 change is the contention that the defendants then agreed to refuse to negotiate commissions on an individual basis, as had been done previously to some extent, thus requiring proof by each class member that it could have negotiated more advantageous prices absent the alleged conspiracy.  In view of these circumstances, they suggest, impact, let alone the amount of damages, cannot be established on a class-wide basis.

Price fixing conspiracies, at least to the extent they succeed in fixing prices, almost invariably injure everyone who purchases the relevant goods or services.[13]  Defendants appear greatly to exaggerate the extent to which individualized proof of impact may be required.

To begin with, defendants do not here dispute that the allegedly collusive 1993 increase in the buyer's premiums adversely affected all or substantially all buyers. "Cheating," or individually negotiated deviations from the agreed premiums, the frequency of which has not been identified by defendants, quite likely did not eliminate all adverse impact even on the favored buyers. The allegedly agreed rate schedules probably raised the base from which the negotiations began and may well have resulted in individually negotiated buyer's premiums, to the extent they existed, higher than would have been agreed upon in the absence of the conspiracy.  Thus, it appears that the impact question with respect to buyers' premiums following the alleged 1993 agreement actually is common to the entire class.  It is common at least to the class members who did not negotiate individual deals, and defendants have provided no evidence that there is a sufficient number of class members who benefitted from individual arrangements as to make any individual questions as to impact a substantial part of the equation here.

The alleged 1995 agreement on the structure of the sellers' commissions and to eliminate individual negotiation of such commissions with customers yields to much the same analysis.  Everything that has been said thus far about the significance of cheating and individual negotiations on the agreed commission schedules applies here as well. Moreover, defendants' contention that the agreed commission schedules adopted in 1995

---

**12.**  See, e.g., McGuire Oil Co. v. Mapco, Inc., 958 F.2d 1552, 1557–58 (11th Cir.1992); Olympia Co. v. Celotex Corp., 771 F.2d 888, 891 (5th Cir.1985); Response of Carolina, Inc. v. Leasco Response, Inc., 537 F.2d 1307, 1320 (5th Cir. 1976); Elder–Beerman v. Federated Dep't Stores, Inc., 459 F.2d 138, 148 (6th Cir.1972); Simpson v. Union Oil Co. of Calif., 311 F.2d 764, 767 (9th Cir.1963), rev'd on other grounds, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964); Continental Ore Co. v. Union Carbide and Carbon Corp., 289 F.2d 86, 89 (9th Cir.1961), vacated on other grounds, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962).

**13.**  See, e.g., In re Master Key Antitrust Litig., 528 F.2d 5, 12 n. 11 ("if the appellees establish ... that the defendants engaged in an unlawful national conspiracy which had the effect of stabilizing prices above competitive levels, and further establish that the appellees were consumers of that product, we would think that the jury could reasonably conclude that appellants' conduct caused injury to each appellee"); In re Alcoholic Beverages Litig., 95 F.R.D. 321, 327 (E.D.N.Y. 1982) ("as a general rule, an illegal price-fixing scheme presumptively impacts upon all purchasers of a price-fixed product in a conspiratorially affected market").

were lower than the prior schedules is a red herring. The issue is whether they were higher or lower than the commissions that would have been charged in the absence of the alleged conspiracy, not whether they were higher or lower than previously.

The view that the impact question is likely to be determinable on a class-wide or substantially class-wide basis[14] draws considerable support also from the nature of this business. As one of plaintiffs' experts has pointed out, the services provided by defendants are highly homogeneous—the services provided by the two defendants appear to be virtually interchangeable from the customers' points of view. Each recognizes the other as its main competitor. Price therefore is a principal means of competition, as neither defendant could profit by a unilateral price increase because customers readily would transfer their business to the other, cheaper competitor. Hence, absent the alleged conspiracy, all or substantially all customers would have benefitted from active competition, chiefly or substantially on the basis of price.[15]

Christie's relies on *Windham v. American Brands, Inc.*[16] and similar cases for the propositions that impact is not presumed, but is an element of the claim of each class member, and that there is "no room for awarding damages to some amorphous fluid class" as opposed to permitting individual class members to recover the damages actually sustained by them.[17] The second of these premises has no bearing here, as plaintiffs make no such claim. And the first, as Judge Conner has written, "often makes little [practical] difference."[18] Presumption or not,

"[a]ntitrust defendants are free to argue, as many of them do, that their cases are exceptional because too many variables enter into setting prices in their industries to permit common proof of impact. Once a defendant raises that contention, the court must examine the circumstances of the industry in question to determine whether common proof of impact is possible in that case."[19]

The Court cannot exclude the possibility that there will be some individualized questions pertaining to impact. It perhaps even is likely that the prices paid by some class members will have to be compared to a construct of the prices that would have prevailed absent the alleged conspiracy in order to determine whether they in fact were injured by it. But the Court is persuaded, at least on the present record, that the impact question is quite predominantly a common question.

### 2. Amount of Damages

Sotheby's suggests that "there is no one method or theory of calculating (or estimating) damages that can be applied to each member of the proposed class."[20] But the statement, even if correct, is far too general to be of much help in resolving the predominance issue.

The fundamental question in determining the amount of damages sustained by any individual class member will be the extent to which the price that member paid for defendants' services exceeded the price that would have obtained absent the conspiracy, i.e., the competitive price. The rate schedules that would have been employed absent the alleged conspiracy likely can be estimated by econometric methods.[21] Hence, the calculation of

**14.** In other words, it is likely that the price levels that would have obtained absent the conspiracy will be determined, in which case the Court could redefine the class, or those entitled to recover, to include only those who paid in excess of those levels, each of which will have been injured in fact by the alleged conspiracy. Professor Houthakker, a former member of the Council of Economic Advisers and a former chairman of the Department of Economics at Harvard University, has submitted an affirmation making essentially this point. *See* Houthakker Aff. ¶ 8.

**15.** Beyer Aff. ¶ 17.

**16.** 565 F.2d 59 (4th Cir.1977), *cert. denied*, 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978).

**17.** *Id.* at 65–66.

**18.** *In re Industrial Diamonds Antitrust Litig.*, 167 F.R.D. 374, 382 (S.D.N.Y.1996).

**19.** *Id.*

**20.** Sotheby's Mem. 6.

**21.** Houthakker Aff. ¶¶ 6–8; Beyer Aff. ¶¶ 26–30.

the damages sustained by those class members who paid for defendants' services according to the published schedules is likely to require only a simple calculation, a ministerial task. Nor does there appear to be any serious obstacle to the effective application of a similar approach to those customers who negotiated prices individually or aggregated their business with a defendant to determine their prices under the rate cards.[22] In any case, there is no evidence before the Court to suggest that there are so many customers who individually negotiated rates or aggregated business to determine rates as to render the damages issue predominantly individual, even if determination of damages for such customers required substantial individual attention.

\* \* \* \* \* \*

Based on the evidence now before it, the Court finds that questions of fact and law common to the class predominate over questions affecting only individual class members.

*Superiority*

This case appears at this stage to involve large numbers of defendants' customers who allegedly were overcharged pursuant to a common scheme and mechanism and who have relatively small stakes. "Multiple lawsuits would be costly and inefficient, and the exclusion of class members who cannot afford separate representation would be neither 'fair' nor an 'adjudication' of their claims."[23] The superiority of the class action device in such circumstances is clear. Indeed, defendants do not seriously dispute this. Christie's rests its contention that a class action would not be a superior means of resolving this controversy solely on the premise that individual issues relating to impact would predominate over common issues, a premise that the Court rejects.

*Conclusion*

The Court finds that all of the requirements of Rules 23(a) and 23(b)(3) are satisfied and determines that these consolidated actions shall be maintained as a class action on behalf of the class alleged in the complaint. This determination is conditional and may be altered or amended prior to the decision on the merits in light of any changes in circumstances that make such action advisable.[24]

SO ORDERED.