Charlotte KRUMAN, et al., Plaintiffs,

v.

**CHRISTIE'S INTERNATIONAL PLC, et al., Defendants.**

No. 00Civ.6322(LAK).

United States District Court, S.D. New York.

Jan. 29, 2001.

David J. Bershad, J. Douglas Richards, Michael M. Buchman, Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY, Michael D. Hausfeld, Ann C. Yahner, Daniel A. Small, Paul T. Gallagher, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, DC, Robert A. Skirnick, Maria A. Skirnick, Meredith, Cohen, Greenfogel & Skirnick, P.C., Philadelphia, PA, Karen L. Morris, Seth D. Rigrodsky, James A. McShane, Morris & Morris, Wilmington, DE, Anthony J. Bolognese, Spector, Roseman & Kodroff, P.C., Philadelphia, PA, Frederick P. Furth, Bruce J. Wecker, Ben S. Furth, The Furth Firm, San Francisco, CA, for Plaintiffs.

Shepard Goldfein, Michael L. Weiner, Clifford H. Aronson, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, for Defendants Christie's, Inc., Christie's International PLC and Daniel P. Davison.

Steven Alan Reiss, A. Paul Victor, Howard B. Comet, Richard J. Davis, Weil, Gotshal & Manges LLP, New York, NY, for Defendants Sotheby's Inc. and Sotheby's Holdings, Inc.

Carey R. Dunne, Michael Patrick, Benjamin Means, Davis Polk & Wardwell, New York, NY, for Defendant A. Alfred Taubman.

John S. Siffert, H. Melissa Mather, Lankler Siffert & Wohl, New York, NY, for Defendant Diana D. Brooks.

Stephen P. Davidson, Piper, Marbury, Rudnick & Wolfe, New York, NY, for Defendants Max M. Fisher, Michael L. Ainslie, and Kevin A. Bousquette.

Martin J. Auerbach, New York, NY, for Defendant Francois Curiel.

Michael S. Shuster, Sheron Korpus, White & Case, New York, NY, for Defendant Stephen S. Lash.

Andrew J. Levander, Yun G. Lee, Swidler Berlin Shereff Friedman, LLP, New York, NY, for Defendant Max M. Fisher.

Edward M. Shaw, New York, NY, for Defendant Michael L. Ainslie.

## MEMORANDUM OPINION

KAPLAN, District Judge.

These motions present the question whether persons who allegedly were overcharged for auction services in auctions held outside the United States may sue in federal court, either under the U.S. antitrust laws or customary international law, if the overcharges were imposed as a result of a price fixing conspiracy partly agreed to and pursuant to which overt acts have been committed in the United States.

*Facts*

Sotheby's and Christie's are the world's two largest auctioneers of fine arts and antiques through sales rooms located principally in New York and London and are said to account for over 90 percent of the market for those services. In January 2000, word leaked that Christie's had availed itself of the conditional amnesty program of the Antitrust Division of the United States Department of Justice and confessed that it had engaged in fixing prices of auction services with Sotheby's. As one might expect, a veritable flood of class actions was filed in response to this news, each seeking to recover damages under the United States antitrust laws on behalf of variously described classes of purchasers and sellers who bought or sold through these houses at non-internet auctions held in the United States.

Not long after the flood began, most of the myriad of plaintiffs' counsel agreed to an organizational structure for managing the cases that contemplated five firms acting as lead counsel on behalf of the plaintiff classes. The Court appointed the five firms, as well as a sixth which sought inclusion, as interim lead counsel. Following certification of the class,[1] however, the Court announced an auction for the position of lead counsel and, in May 2000, selected David Boies and Richard Drubel, who had not been among the interim lead counsel, to act for the class.[2]

In August and September 2000—just before the announcement of a proposed settlement of the cases based on the U.S. auctions for $512 million—seven law firms filed the complaints in these three actions, which seek to recover damages under the United States antitrust laws on behalf of an alleged class of persons who bought or sold through Christie's and Sotheby's at non-internet auctions held *outside* the United States. Three of the seven law

---

**1.** *In re Auction Houses Antitrust Litig.,* 193 F.R.D. 162 (S.D.N.Y.2000) (certifying class).

**2.** *See id.,* 197 F.R.D. 71 (S.D.N.Y.2000) (explaining auction procedure).

firms had been unsuccessful bidders in the lead counsel auction. Three had been among the six firms that served as interim lead counsel. Both auction houses and certain individual defendants now move to dismiss the complaint.

The plaintiffs in this case are eight persons or entities who purchased or sold items through auctions conducted by Christie's, Sotheby's or both. Four of the plaintiffs are located in the United States, two in Canada, and two in the United Kingdom. All purchased or sold items at auctions conducted outside the United States, principally in London, although the goods they purchased or sold in some instances were displayed prior to sale in the United States as well as abroad. All paid sellers' commissions or buyers' premiums that allegedly were inflated as a result of the alleged conspiracy. They sue on behalf of a purported class consisting of all persons who (a) purchased items at Christie's or Sotheby's non-internet auctions held outside the United States and paid buyers' premiums during the period January 1, 1993 through February 7, 2000, or (b) sold items at Christie's or Sotheby's non-internet auctions held outside the United States and paid sellers' commissions during the period September 1, 1995 through February 7, 2000.

The complaint alleges that the auction house defendants agreed in late 1992 on a identical buyers' premiums to be effective on January 1, 1993 for Sotheby's and March 1, 1993 for Christie's.[3] It alleges further that defendants in early 1995 extended their agreement to the imposition of a common, non-negotiable schedule of commissions charged to sellers of items at their auctions, a schedule that became effective at Christie's on or about March 10, 1995 and at Sotheby's on or about April 13, 2000.[4]

Plaintiffs maintain that the defendants' agreements "had the effect of inflating the buyer's premiums and seller's commissions that Sotheby's and Christie's charged to the public and members of the Class."[5] They assert that most of the defendants' conspiratorial conduct occurred in the United States, that many class members are American citizens, that defendants derived more revenue from auctions in the United States than abroad, that defendants intended and expected that their scheme would affect buyers and sellers worldwide, and that defendants' conduct had direct, substantial and foreseeable effects in the United States.[6] In addition, they have submitted an affidavit from an economist who offers his opinion that (1) the market for defendants' auction services is international and not limited to the United States, and (2) the prices of their services, wherever offered, are affected by the same forces of supply and demand.[7]

The complaint alleges two claims for relief. Count I alleges that defendants' activities violated Sections 1 and 3 of the Sherman Act[8] and seeks treble damages and attorney's fees in the millions of dollars. Count II maintains that defendants' conduct violated "customary international law"[9] and seeks essentially the same relief as Count I, although it is unclear whether plaintiffs claim a right to treble as opposed to single damages on this claim.

*Discussion*

*I. The Sherman Act Claim*

█ The fundamental question here is whether a transnational price fixing conspiracy that affects commerce both in the United States and in other countries inevi-

---

3. Consolidated and amended class action complaint ("Cpt") ¶¶ 36–40.

4. *Id.* ¶¶ 41–44.

5. *Id.* ¶ 57.

6. *Id.* ¶ 58.

7. Beyer Aff. ¶¶ 8, 15 and *passim*.

8. 15 U.S.C. §§ 1, 3.

9. Cpt ¶ 72.

tably gives persons injured abroad in transactions otherwise unconnected with the United States a remedy under our antitrust laws. Unless the Court is to impute to Congress an intention to establish an antitrust regime to cover the world, the answer must be "no." There is no basis for imputing such an intent.

The Sherman Act long was held to reach conduct abroad only if the conduct was intended to have, or had, significant effects within the United States.[10] Indeed, Congress in 1982 enacted the Foreign Trade Antitrust Improvements Act ("FTAIA") for the purpose, among others, of "exempt[ing] from United States antitrust law conduct that lacks the requisite domestic effect, even where such conduct originates in the United States or involves American-owned entities abroad."[11]

The statute provides in pertinent part that the Sherman Act "shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless ... such conduct has a direct, substantial, and reasonably foreseeable effect ... on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations" and "such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section."[12] And while the statute is not elegantly drafted,[13] its scope is quite clear. As the House Report recommending its passage stated:

> "A transaction between two foreign firms, even if American-owned, should not, merely by virtue of the American ownership, come within the reach of our antitrust laws. Such foreign transactions should, for the purposes of this legislation, be treated in the same manner as export transactions—that is, there should be no American antitrust jurisdiction absent a direct, substantial and reasonably foreseeable effect on domestic commerce or a domestic competitor.

> \*   \*   \*   \*   \*   \*

> "The intent of the Sherman and FTC Act amendments ... is to exempt from the antitrust laws *conduct* that does not have the requisite domestic effects. This test, however, does not exclude all persons injured abroad from recovering under the antitrust laws of the United States. A course of conduct in the United States—*e.g.*, price fixing not limited to the export market—would affect all purchasers of the target products or services, whether the purchaser is foreign or domestic. The *conduct* has the requisite effects within the United States, even if some purchasers take title abroad or suffer economic injury abroad. *Cf., e.g., Pfizer Inc. v. Government of India, et al*, 434 U.S. 308, 98 S.Ct. 584,

---

**10.** *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 443–44 (2d Cir.1945) (sitting as court of last resort); *see also Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) ("Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States"); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 582 n. 6, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ("The Sherman Act does reach conduct outside our borders, but only when the conduct has an effect on American commerce."); *National Bank of Canada v. Interbank Card Ass'n*, 666 F.2d 6, 8–9 (2d Cir.1981).

**11.** *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 814 (9th Cir.1988) (quoting *Eurim-*

*Pharm GmbH v. Pfizer, Inc.*, 593 F.Supp. 1102, 1106 (S.D.N.Y.1984)). *Accord*, H.R. Rep. No 97–686, at 7–8 (1982) ("House Report") 1982 U.S.C.C.A.N. 2487 (quoting remarks of Chairman Rodino, 127 Cong. Rec. H. 779 (daily ed. Mar. 4, 1981)) (Sherman Act does not apply to conduct unless it has "a direct and substantial effect on commerce within the United States or a domestic firm competing for foreign trade").

**12.** 15 U.S.C. § 6a.

**13.** *E.g., United States v. Nippon Paper Indus. Co.*, 109 F.3d 1, 4 (1st Cir.1997), *cert. denied*, 522 U.S. 1044, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998).

54 L.Ed.2d 563 (1978). Foreign purchasers should enjoy the protection of our antitrust laws *in the domestic marketplace*, just as our citizens do. Indeed, to deny them this protection could violate the Friendship, Commerce and Navigation treaties this country has entered into with a number of foreign nations."

\* \* \* ·\* \* \*

"[T]he full Committee added language to the Sherman and FTC act amendments to require that the 'effect' providing the jurisdictional nexus must also be the basis for the injury alleged under the antitrust laws. This does not, however, mean that the impact of the illegal conduct must be experienced by the injured party within the United States.... [I]t is sufficient that the conduct providing the basis of the claim has had the requisite impact on the domestic or import commerce of the United States or, in the case of conduct lacking such an impact, on an export opportunity of a person doing business in the United States." [14]

Thus, the FTAIA permits suit, insofar as is relevant here, only where the conduct complained of had "direct, substantial and reasonably foreseeable effects" in the United States and the effects giving rise to jurisdiction also are the basis for the alleged injury. [15]

■ It is important at the outset to recognize that much of plaintiffs' position depends upon needless imprecision in the use of the word "conduct." The word is a broad one with ample capacity for being understood as a reference to an entire chain of actions or, alternatively, to a single act. It does no violence to the English language to use "conduct" to refer to the totality of defendants' actions, thus permitting plaintiffs to argue that defendants' "conduct" took place in substantial part in the United States. But that usage obscures the real issue here. There appears to be little doubt that meetings in which this conspiracy was formed or continued and acts in furtherance of the conspiracy occurred both in the United States and elsewhere. The precise acts that caused injury, however, were the imposition of charges for auction services at levels determined or affected by the illicit agreement. Some of those acts occurred here. Some—those of which plaintiffs in these cases complain—took place abroad.

In these circumstances, it is perfectly appropriate for the United States to punish the conspiracy [16]—the formation and continuation of the illicit agreement—because it took place in substantial part in this country. [17] It is perfectly appropriate for the United States to punish and provide remedies for injuries suffered in consequence of overt acts in furtherance of the conspiracy, such as the imposition of fixed prices, that occurred here—those acts both occurred and had effects here. [18] But it would be appropriate for the United States to provide remedies for injuries suffered in consequence of overt acts that occurred outside this country only if those acts, either individually or perhaps collec-

**14.** HOUSE REPORT 9–12 (emphasis added).

**15.** *In re Copper Antitrust Litig.,* 117 F.Supp.2d 875, 883 (W.D.Wis.2000).
The quoted portion of the House Report does indicate a Congressional intention that the effects test be satisfied by conduct committed within the United States that has effects both within and without the country. But the third sentence of the first paragraph and the penultimate sentence of the second paragraph quoted in the text make clear that purchasers in entirely foreign transactions who do not suffer from any lessening of competition with-

in the United States have no claim. *See In re Microsoft Corp., Antitrust Litig.,* 127 F.Supp.2d 702, 714–15 (D.Md.2001).

**16.** Of course we are speaking of criminal liability, as conspiracy alone causes no injury and thus raises no issue of damages.

**17.** *See* RESTATEMENT (THIRD) FOREIGN RELATIONS LAW OF THE UNITED STATES ("RESTATEMENT") § 402(1)(a) (1987).

**18.** *Id.* §§ 402(1)(a), 402(1)(c).

tively, had direct, substantial and reasonably foreseeable effects here that caused the injuries to be remedied. That did not occur in this case.

■ This conclusion is no more than a straight forward application of the fundamental 'notion, widely respected by U.S. courts, of prescriptive jurisdiction. The power of the United States to prescribe a rule of conduct for extraterritorial transactions, its prescriptive jurisdiction, depends, so far as is relevant here, on those transactions having a substantial effect within U.S. territory.[19] To grant a remedy under U.S. law where, as here, the transactions for which that remedy is sought had no such effect would be an unwarranted assertion of American power.[20]

Plaintiffs resist this result on several grounds, first among them a contention that the effects test applies only to purely foreign conduct, whereas the alleged conspiracy in this case operated both here and overseas. They rely on *Carpet Group International v. Oriental Rug Importers Ass'n.*[21] But the argument depends upon the imprecision in the word "conduct" that the Court finds confusing rather than helpful. The precise conduct that injured plaintiffs occurred only abroad. Moreover, *Carpet Group* does not support plaintiffs' argument. The Third Circuit there merely upheld the exercise of Sherman Act jurisdiction, in a straightforward application of accepted principles, against defendants charged with preventing foreign manufacturers from selling to certain U.S. retailers to prevent them from competing with U.S. wholesalers.[22]

■ Also unpersuasive is plaintiffs' argument that the defendants' here were engaged in conduct involving import commerce, which is exempted from the FTAIA.[23] The fact that some of the plaintiffs may have purchased goods at foreign auctions for the purpose of importing those goods into the United States does not make this a case involving import commerce except, perhaps, under a remarkable tendentious reading of the word "involving." The commerce that is the focus of this case is the charging of fixed commissions on the purchase and sale of goods at foreign auctions, not the trade in and subsequent movement of the goods that were purchased and sold. Indeed, if plaintiffs view were accepted, a conspiracy to fix the retail price of gasoline in London might well involve U.S. import commerce on the theory that some of the gasoline no doubt is purchased in order to fuel trucks carrying to ports of embarkation goods destined for shipment to the United States.

These complaints seek damages for transactions which, although influenced by a conspiracy with important U.S. elements, were entirely foreign and had no direct,

19. *E.g., id.* § 402(1)(c). *See generally, e.g., United States v. Javino,* 960 F.2d 1137, 1142 (2d Cir.), *cert. denied,* 506 U.S. 979, 113 S.Ct. 477, 121 L.Ed.2d 383 (1992) (relying on RESTATEMENT § 402); *Consolidated Gold Fields PLC v. Minorco S.A.,* 871 F.2d 252, 261–62, *opinion amended,* 890 F.2d 569 (2d Cir.), *cert. dismissed,* 492 U.S. 939, 110 S.Ct. 29, 106 L.Ed.2d 639 (1989) (same).

20. In view of this conclusion, the result in this case would be identical even in the absence of the FTAIA.

21. 227 F.3d 62 (3d Cir.2000).

22. Plaintiffs argue that the Third Circuit there held that "no 'effects' test even comes into play" where a challenge to a defendant's anticompetitive conduct "deals primarily with conduct in the United States." Pl. Mem. 5. But they distort the holding of the case. *Carpet Group,* insofar as it is relevant here, stands for no more than the common sense proposition that there was no need to resort to the effects test to sustain jurisdiction in view of the fact that the focus of the case was upon a U.S. based conspiracy, the purpose of which was to injure competition here. Indeed, the full sentence from which plaintiffs have taken the phrase upon which they rely reads: "No one claims that the conduct here at issue is 'local in nature [i.e., entirely foreign],' and therefore no 'effects' test even comes into play." 227 F.3d at 75.

23. Pl. Mem. 7.

substantial or foreseeable effects in the United States. Accordingly, the antitrust claim must be dismissed.

## II. The Alien Tort Claims Act Claims

The Alien Tort Claims Act[24] confers jurisdiction on district courts to hear "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." Plaintiffs maintain that "a broad consensus has developed that certain basic anticompetitive activities, such as ... price-fixing ... [are] condemned worldwide" and thus "have risen to the level of customary international law ..."[25] Accordingly, they argue, this Court has subject matter jurisdiction over the second count on the theory that defendants' actions were torts "committed in violation of the law of nations."

■■■ Plaintiffs' position, which only recently was rejected in the *Microsoft* case,[26] borders on the frivolous. Customary international law, sometimes referred to as the law of nations, consists of those rules that "command the 'general assent of civilized nations.'"[27] There is no substantial support for the proposition that there is an international consensus proscribing price fixing that fairly might be characterized as customary international law,[28] much less an international consensus that price fixing gives rise to tort claims on behalf of victims. In consequence, it is unnecessary even to consider whether, as defendants maintain, violations of the law of nations require state action.[29]

24. 28 U.S.C. § 1350.

25. Pl. Sep. Mem. 7–8.

26. *In re Microsoft Antitrust Litig., supra,* at 725.

27. *Filartiga v. Pena–Irala,* 630 F.2d 876, 881 (2d Cir.1980) (quoting *Paquete Habana,* 175 U.S. 677, 694, 20 S.Ct. 290, 44 L.Ed. 320 (1900)); *see also Kadic v. Karadzic,* 70 F.3d 232, 239 (2d Cir.1995), *cert. denied,* 518 U.S. 1005, 116 S.Ct. 2524, 135 L.Ed.2d 1048 (1996).

28. *See* Salil K. Mehra, *Extraterritorial Antitrust Enforcement and the Myth of Internation-*

*Conclusions*

Defendants' motions to dismiss the complaints in these actions[30] are granted in all respects.

SO ORDERED.

*al Consensus,* 10 Duke J. Comp. & Int'l L. 191, 220 (1999) (divergence among competition policies of different nations); Eleanor M. Fox, *Toward World Antitrust and Market Access,* 91 Am. J. Int'l L. 1, 12 (1997) ("[m]any nations do not have a tradition of antitrust").

29. Def. Taubman Mem. 20.

30. The motions disposed by this opinion include docket items 214, 225 and 378 in 00 Civ. 0648 and docket items 16, 36, 39 and 41 in 00 Civ. 6322.