## In re AUCTION HOUSES ANTITRUST LITIGATION

**This Document Relates to: All Actions**

**No. 00 CIV. 0648(LAK).**

United States District Court,
S.D. New York.

April 12, 2001.

David Boies, Richard Drubel, Boies Schiller & Flexner LLP, New York City, for Plaintiffs.

---

Shepard Goldfein, Michael L. Weiner, Skadden, Arps, Slate, Meagher & Flom LLP, New York City, for Defendants Christie's International plc and Christies, Inc.

Richard J. Davis, Steven A. Reiss, Howard B. Comet, Weil, Gotshal & Manges LLP, New York City, for Defendants Sotheby's Holdings, Inc. and Sotheby's, Inc.

## MEMORANDUM OPINION (corrected)

KAPLAN, District Judge.

The background of this action is amply set forth in previous opinions, familiarity with which is assumed.[1] On February 22, 2001, this Court granted final approval to the proposed settlement of these actions for more than $512 million subject to the conditions that the parties amend (1) "[t]he settlement documents to conform the releases to the requirements of [the Court's] opinion," and (2) other settlement documents to contain provisions satisfactory to the Court "to maximize the value of the certificates, the prospects for the development of an efficient secondary market, and the likelihood that one or more qualified persons will make a market in the certificates."[2]

On March 12, 2001, plaintiffs and the auction house defendants submitted for approval proposed changes in the settlement designed to address the Court's conditions. Rather than conforming the release to the requirements of the Court's opinion, they propose to allocate $7 million in face amount of discount certificates that previ-ously were intended to compensate class members for injuries sustained in U.S. auction transactions to compensate class members who also have claims based on foreign auctions for giving up any rights they may have to sue on such claims in U.S. courts. They seek to deal with the second condition by altering the certificate plan in a variety of ways. A number of objectors continue to resist final approval, arguing that the proposed changes in the settlement do not satisfy the Court's conditions.[3]

## I

■ The proposed release provides in substance that "[u]pon final approval and distribution of the settlement funds, class members who do not opt out [will] release Christie's, Sotheby's, and certain of their present or former employees, from all claims 'based on any allegedly collusive activity or activities … *wherever occurring or located* ' " with two important exceptions:

(1) All class members will remain free to sue in foreign courts on the basis of foreign law for damages allegedly suffered in foreign auctions.

(2) Class members who choose not to claim benefits under this settlement will retain also whatever rights they otherwise might have to sue in United States courts for damages allegedly suffered in foreign auctions.[4]

The controversy concerns Mixed Class Members—those with claims based on both U.S. and foreign auctions. As the

---

1. *In re Auction Houses Antitrust Litig.*, 197 F.R.D. 71 (S.D.N.Y.2000); *id.*, 193 F.R.D. 162 (S.D.N.Y.2000).

2. *In re Auction Houses Antitrust Litig.*, No. 00 Civ. 0648, 2001 WL 170792, at *18 (S.D.N.Y. Feb. 22, 2001) (hereinafter the *"Settlement Opinion"*).

3. The Court did not require the sending of a new notice to the class. The parties' submission, however, was served on objectors who already had come forward.

4. Agreed Motion, Exs. 1 & 2, ¶ 11(c) (emphasis added).

settlement is drafted, they would be entitled to receive settlement proceeds based only on their alleged overcharges in U.S. auctions, but they would lose the ability to sue in the United States for damages based on overcharges in foreign auctions if they elect to take money under this settlement. This, they contend, is unfair.

The *Settlement Opinion* carefully considered this objection. It began by pointing out that the use of the word "release" to describe the controversial feature of this document is a misnomer because:

"No one is being asked to surrender all claims with respect to foreign auctions. Mixed Class Members may claim the benefit of this settlement and sue abroad under applicable foreign law to recover injuries allegedly sustained abroad. All that is sought in exchange for the settlement consideration is a release of the right to pursue claims based on foreign auctions in courts in this country and under U.S. law in foreign courts."[5]

Nevertheless, the Court, applying *National Super Spuds, Inc. v. New York Mercantile Exchange*,[6] concluded that there is no reason "why some class members should be forced to give up something of value to enable other class members to benefit from a settlement made richer at their expense."[7] It therefore conditioned approval of the settlement on alteration of the "release" to delete the requirement that Mixed Class Members who claim benefits under the settlement sacrifice such rights as they may have to sue in the

United States based on alleged overcharges in foreign auctions.

The parties have seized upon language in the *Settlement Opinion* to contend that the problem the Court perceived might be cured by allocating some of the settlement consideration to compensate Mixed Class Members for the loss of their rights to sue here on claims that are based on foreign auctions. They point out that the proposed settlement called for payment of $512 million—$412 million in cash and discount certificates valued at $100 million[8]— but that defendants have agreed to give $125 million in principal amount of certificates, which the Court has valued in excess of $100 million. So the settlement proponents propose to give some part of an assumed amount in excess of $100 million in value to the Mixed Class Members who claim benefits here, thus keeping the bargain with respect to U.S. auction losses intact while giving those Mixed Class Members some consideration for their loss of a possible U.S. forum for their foreign auction claims. But this proposed solution is not satisfactory.

The Court's objection to the scope of the "release" was that the Mixed Class Members were being asked to surrender something of value, however modest, in order to benefit the other class members. Perhaps if the claims pursued on behalf of the class that was certified had included the foreign auction issues and the deal had been structured from the outset to allocate part of the consideration to compensate Mixed Class Members in this way, it would not have been objectionable.[9] Certainly class

---

5.  *Settlement Opinion*, at *11 (footnote omitted).

6.  660 F.2d 9 (2d Cir.1981).

7.  *Id.* *12.

8.  The use of the discount certificates rather than $100 million in additional cash is merely

an option as the settlement papers are drafted. Defendants, however, have made clear that they intend to exercise their option, so the Court for ease of exposition simply assumes that the deal involves the certificates.

9.  *See, e.g., Weinberger v. Kendrick*, 698 F.2d 61, 77 (2d Cir.1982), *cert. denied*, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983) (class

action settlements frequently are structured to give different compensation to different groups of class members who were affected differently by the conduct at issue. But that is not the way this settlement came to pass.

Here, the foreign auction claims, while mentioned in the complaint, never were among the claims pursued on behalf of the class, which was defined solely in terms of participation in U.S. auctions during the relevant period. The settlement was negotiated in terms of compensation to be paid with respect to claimed overcharges for services rendered in U.S. auctions. And while the Court does not question anyone's good faith or professionalism, this history explains how Plaintiffs' Lead Counsel have come to have a structural conflict on this issue. They reached a settlement that, as modified, called for payment of $412 million in cash and $125 million in principal amount of discount certificates to class members based on their overcharges in U.S. auctions. By doing so, they earned themselves a fee of more than $26.75 million, contingent upon the settlement becoming effective. At that moment, they gained a powerful incentive to protect the settlement and thus their large fee. They thus have an incentive to acquiesce in defendants' insistence that the deal proceed without modifying the "release." And that incentive has manifested itself in their willingness to allocate part of the outstanding recovery they gained with respect to claims based on U.S. auctions to those among them who, in addition, have claims based on foreign auctions. In principle, that is no different than what the Court of Appeals condemned in *Super Spuds.*

Second, the parties' tinkering with the transaction presupposes that the $118 million in principal amount of discount certificates that would remain after reallocating $7 million to the Mixed Class Members will be worth at least $100 million, as any lower valuation would result in reducing the consideration to be paid with respect to alleged U.S. auction overcharges to less than $512 million.[10] But the Court quite deliberately avoided placing a precise valuation on the discount certificates in conditionally approving the settlement.[11] The critical point for purposes of the *Settlement Opinion* was that they will be worth at least 80 cents on the dollar, a finding the Court was quite comfortable in making despite some conflicting evidence. Implicit in the current proposal, however, is a valuation of at least 85 cents on the dollar. The Court is not prepared to go that far.

Finally, although the Court does not rely on the point in reaching this decision, it cannot help but observe that this *contretemps* appears to be a tempest in a teapot. It is difficult to see why defendants resist modification of the release so strenuously. Any U.S. law-based claims with respect to foreign auctions already have been dismissed, and that decision is consistent with a unanimous line of authority on the point.[12] In any case, as the Court previously noted, any claims brought in U.S. courts with respect to foreign auctions al-

---

expanded prior to certification to include added claims, which then were released upon payment of part of settlement proceeds).

10. This figure is pivotal because that was the consideration set forth in the notice sent to class members.

11. *Settlement Opinion,* at *9–10.

12. *Kruman v. Christie's Int'l PLC,* No. 00 Civ. 6322(LAK), 2001 WL 77059 (S.D.N.Y. Jan.29, 2001). *Accord. Den Norske Stats Oljeselskap As v. HeereMac Vof,* 241 F.3d 420, 429 (5th Cir.2001) (citing *Kruman* ); *In re Microsoft Corp., Antitrust Litig.,* 127 F.Supp.2d 702, 714–15 (D.Md.2001); *In re Copper Antitrust Litig.,* 117 F.Supp.2d 875, 883 (W.D.Wis. 2000).

most certainly would be dismissed on the basis of forum selection clauses or the doctrine of *forum non conveniens*.[13] Nor are the objectors' arguments very compelling, chiefly because they are so riddled with overstatement. Some do not address the fact that the Mixed Class Members are being asked to surrender only whatever right they might have to sue in the United States based on their foreign claims, not the claims themselves. They assume that they are being asked to give up the foreign claims altogether and argue from that erroneous premise.[14] At least one adopts an interpretation of *Kruman*, which dismissed Sherman Act claims seeking damages for overcharges allegedly imposed for services rendered in foreign auctions, that is irreconcilable with the decision.[15] But the Court is not here to judge the wisdom of the litigants. It is simply to decide whether the proposed reallocation of settlement proceeds cures the problem it perceived in the first place. For the foregoing reasons, it does not.

## II

■ The second of the Court's concerns was with maximizing the prospects for the development of an efficient secondary market for the discount certificates, assuming the settlement becomes effective. In response to the *Settlement Opinion*, the parties have modified the certificate plan to provide that name and contact information for the certificate administrator will be available in notices sent with the certificates, on the certificates themselves (if printed), in auction catalogues, and in remittance statements. The notices and a web site will indicate that contact information about market makers is available from the certificate administrator.

A few objectors persist in their complaints about these aspects of the certificate plan, chiefly on the ground that the pivotal figure in ensuring the dissemination of information critical to the development and maintenance of an efficient market—the certificate administrator—will be paid by the defendants. The short answer to this contention is that the certificate plan requires the certificate administrator to "facilitate the development and operation of a secondary market in the Certificates ..." The judgment will require the parties to consummate the settlement, assuming it becomes effective, in accordance with its terms. Accordingly, the Court will retain ultimate authority over the certificate administrator and thus will be in a position to deal with any problems that may arise.

The condition relating to the certificate plan has been satisfied.

## III

In all the circumstances, the parties are given to and including April 2, 2001 to file

---

13. *Settlement Opinion*, at *11.

14. *E.g.,* Alpers' memorandum in opposition to proposed agreed order (DI No. 527); Objection and memorandum in support of objection of plaintiff Ronald Mintz, at 2–3; *see also* Objection and memorandum in support of the objection of J & J Lubrano, et al., at 5–6 (contending that proposed allocation of discount coupons inadequate because worth less than 3.8 percent of the overcharge estimate, an argument that is appropriately addressed to a release of the claim but not to the matter of permissible forums for it).

15. The Fataihi Company and Swicorp S.A.'s response to the settling parties' proposed amendment, etc, at 1–2. Contrary to the argument of these objectors, *Kruman* squarely held that persons injured in foreign auctions cannot recover under the Sherman Act. *Kruman*, 2001 WL 77059, at *2, *4. The fact that these objectors claim to have been injured also by overcharges for services rendered in U.S. auctions is entirely immaterial.

appropriate papers modifying the release in a manner conforming to the *Settlement Opinion* and this order. Should they fail to do so, the motion for approval of the settlement and related documents will be denied. In that event, there will be a conference on April 3, 2001 at 2:15 p.m. to set a schedule for the completion of discovery and the trial of these cases.

SO ORDERED.