**EURIM–PHARM GmbH, Plaintiff,**

v.

**PFIZER INC.; Pfizer Group Limited: Pfizer GmbH; Pfizer Italiana, S.p.A.; Pfizer France, S.A.: Laboratoires Pfizer S.A.R.L.; and Pfizer Corporation, Defendants.**

**No. 83 Civ. 2430 (MJL).**

United States District Court,
S.D. New York.

Sept. 17, 1984.

Schwartz, Klink & Schreiber, P.C., New York City, for plaintiff.

Gibson, Dunn & Crutcher, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

LOWE, District Judge.

Plaintiff Eurim-Pharm ·GmbH has brought this action against defendants Pfizer, Inc., Pfizer Group Limited, Pfizer GmbH, Pfizer Italiana, S.P.A., Pfizer France, S.A., Laboratoires Pfizer S.A.R.L., and Pfizer Corporation, claiming violations of section 1 of the Sherman Act, as amended (15 U.S.C. § 1). Defendants have moved pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted. For the reasons set forth below, the motion is granted.

### Background

Plaintiff is a limited entity organized and existing under the laws of the Federal Republic of Germany with its principal place of business in Piding/Reichenhall, Federal Republic. Plaintiff is engaged in business as a distributor, wholesaler, importer and exporter of brand-name pharmaceutical products produced by multinational pharmaceutical companies. There are six named defendants as well as an undetermined number of unnamed co-conspirators. Of the six named defendants, Pfizer, Inc. is a Delaware corporation with its principal place of business in New York, New York. Pfizer, Inc. is engaged in interstate and foreign commerce in various businesses including the formulation, manufacture and sale of pharmaceutical products. The five remaining named defendants are all wholly-owned foreign subsidiaries of Pfizer, Inc., incorporated in and with their principal places of business throughout Europe and Central America. These foreign subsidiaries are all engaged in the business of manufacturing pharmaceutical products, solely within Europe. The unnamed co-conspirators are foreign manufacturers, distributors, jobbers and wholesalers of Pfizer pharmaceutical products, whose identities presently are not known to the plaintiff.[1]

---

1. In *Copperweld Corp. v. Independence Tube Corp.*, —— U.S. ——, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), the Supreme Court held that a parent corporation and its wholly-owned subsidiaries are incapable of conspiring with each other for the purposes of section 1 of the Sherman

Act as section 1 does not reach conduct that is "wholly unilateral". Therefore, it is clear that plaintiff can no longer claim that Pfizer, Inc., the parent corporation, conspired with is foreign subsidiaries to violate the antitrust laws. However, since we find that the Court lacks

*Facts*

The essence of plaintiff's claim is that defendants participated in a price-fixing and market allocation scheme to maintain their stronghold on the world market of the antibiotic Vibramycin after defendants' patent of the drug expired. Plaintiff alleges, and for purposes of this motion we must assume to be true, that under this scheme Pfizer, Inc. granted an exclusive license for producing Vibramycin to a foreign manufacturer in each major foreign market. These foreign manufacturers consisted of either wholly-owned foreign subsidiaries of Pfizer, Inc. or local foreign manufacturing companies. The foreign manufacturers agreed with Pfizer, Inc. to restrict their sales of Vibramycin to distributors, wholesalers and jobbers who in turn agreed to confine their sales to specific geographic areas assigned by Pfizer, Inc. at prices prescribed by Pfizer, Inc. and/or the foreign manufacturer. Any distributor, wholesaler or jobber who failed to honor this agreement with the foreign manufacturer would initially be warned by oral communications and would later be subject to reprisals, such as reduced allocations or delayed shipments. If these warnings and reprisals were not successful, the distributor, jobber or wholesaler would be terminated. In certain instances, Pfizer, Inc. would institute a trademark infringement action against those who did not comply with established policy.

Plaintiff alleges that as a result of this scheme, Pfizer, Inc. has maintained a substantial share of the world market for antibiotic products, both prior to and after the expiration of defendants' patents. Further, plaintiff claims that the price of Vibramycin has been and continues to be artificially inflated due to defendants' activities.

Plaintiff has sold Vibramycin in the Federal Republic of Germany since 1975.[2] In 1979 plaintiff was able to obtain Vibramy-

cin in the United Kingdom at a price substantially lower than that available from the authorized distributors in the Federal Republic of Germany. Plaintiff repackaged the United Kingdom Vibramycin for direct sale to German retail pharmacies. During this time, Pfizer, Inc. brought a trademark infringement action against plaintiff in the German regional court, contending that plaintiff's repackaging and sale of Vibramycin violated Pfizer's rights as holder of the Vibramycin trademark. The German court granted an injunction barring plaintiff's repackaging and sale of United Kingdom Vibramycin in the Federal Republic. On appeal, the court lifted the injunction and found that the use of a national trademark to exclude competition from the sale of goods acquired in another member state of the European Economic community violated Articles 30 and 36 of the Treaty of Rome. This decision was affirmed by the Court of Justice of the European Communities.

Defendants base their motion to dismiss the complaint upon plaintiff's failure to allege the requisite effect on United States import or domestic commerce. According to defendants, the applicability of the United States antitrust statutes to foreign business transactions is limited to "conduct" which has a "direct, substantial, and reasonably foreseeable effect" on United States domestic, import or export commerce. Sherman Act, ch. 647, § 7, 15 U.S.C. § 6a (1982). Defendants urge that the challenged activities fail to have an anticompetitive effect on United States domestic, import or export commerce because the transactions underlying this action and the effect of these transactions occurred solely within Europe, and the primary actors were European companies doing business solely within Europe.

Plaintiff argues that defendants have participated in and continue to participate

<hr>

subject matter jurisdiction on other grounds, we need not address the question whether plaintiff has adequately pleaded a conspiracy between Pfizer, Inc. and the non-subsidiary companies mentioned in the complaint.

**2.** It is not clear from the parties' papers whether plaintiff continues to sell Vibramycin in the Federal Republic of Germany.

in a worldwide conspiracy which has affected United States domestic commerce by artificially inflating the price of Vibramycin in the United States.

*Discussion*

Section 7 of the Sherman Act sets forth the criteria for determining United States antitrust jurisdiction over international business transactions. 15 U.S.C. § 6a (1982). Under section 7, United States antitrust law

shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—

(1) such conduct has a direct, substantial, and reasonably foreseeable effect—

(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

(2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

If sections 1 to 7 of this title apply to such conduct only because of the operation of paragraph (1)(b), then sections 1 to 7 of this title shall apply to such conduct only for injury to export business in the United States.

Section 7, also known as the Foreign Trade Antitrust Improvements Act, was added to the Sherman Act in 1982 when Congress enacted the Export Trading Companies Act. Due to the absence of case law concerning this amendment, we must turn to the legislative history for guidance in reaching our decision.

The legislative history of section 7 indicates that the amendment was designed to accomplish two main goals. First, the amendment was intended to eliminate the perception among business people that United States antitrust law is a barrier to efficiency-enhancing joint export activities. H.R.Rep. No. 97–686, 97th Cong., 2d Sess. 2, *reprinted in* 1982 U.S.Code Cong. & Ad.News 2431 at 2487 (hereinafter cited as "House Report"). Congress sought to place American-owned companies operating entirely abroad or in United States export trade on equal footing with their foreign-owned competitors by freeing them from the possibility of dual and conflicting antitrust regulation. "[N]o longer is there any possibility that, because of uncertainty growing out of American ownership, such firms will be subject to a different and perhaps stricter regimen of antitrust than their competitors of foreign ownership." House Report at 10, *reprinted in* 1982 U.S.Code Cong. & Ad.News at 2495.

Second, Congress acted to eliminate the uncertainty that had arisen from the confusing array of standards employed by federal courts for determining when United States antitrust jurisdiction attaches to international business transactions. House Report at 2, *reprinted in* 1982 U.S.Code Cong. & Ad.News at 2487.[3] Congress adopted a single objective test that would "serve as a simple and straightforward clarification of existing American law and

---

3. Even before the enactment of section 7, it was the situs of the effect which determined whether United States antitrust law applied to a particular transaction. *United States v. Aluminum Co. of America*, 148 F.2d 416, 443–44 (2d Cir.1945) (Learned Hand, J.). However, in applying this rule, courts had arrived at different formulations for the nature and quantum of "effects" needed. *See, e.g., National Bank of Canada v. Interbank Card Association*, 666 F.2d 6, 8 (2d Cir.1981) (any anticompetitive effect on either United States commerce within the United States or export commerce from the United States); *Dominicus America Bohio v. Gulf & Western Industries, Inc.*, 473 F.Supp. 680, 687 (S.D.N.Y.1979) (not necessary for the effect on foreign commerce to be both substantial and direct as long as it is not *de minimus*); *Waldbaum v. Worldvision Enterprises, Inc.*, 1978–2 Trade Case (CCH) Para. 62,378, at 76,257 (S.D. N.Y.1978) (anticompetitive effects in the United States); *Industria Sciliana Asfalti, Bitumi, S.P.A. v. Exxon Research & Engineering Co.*, 1977–1 Trade Case (CCH) Par. 61.256 at 70,784 (S.D.N. Y.1977) (impact upon United States commerce); *Todhunter-Mitchell & Co., Ltd. v. Anheuser-Busch, Inc.*, 383 F.Supp. 586, 587 (E.D.Pa.1974) (direct effect on the flow of foreign commerce into or out of the United States).

the Department of Justice enforcement standards." House Report at 2, *reprinted in* 1982 U.S.Code Cong. & Ad.News at 2487–88.[4]

▆▆▆ Under section 7, the proscriptions of the Sherman Act apply to trade or commerce with foreign nations, other than import transactions, only when the conduct providing the basis for the claim has a direct, substantial and reasonably foreseeable anticompetitive effect on United States domestic, import or export commerce. The amendment clearly was intended to exempt from United States antitrust law conduct that lacks the requisite domestic effect, even where such conduct originates in the United States or involves American-owned entities operating abroad.

▆▆▆ Section 7 does not, however, preclude all persons or entities injured abroad from recovering under United States antitrust laws. When the activity complained of has a demonstrable effect on United States domestic or import commerce, foreign corporations injured abroad may seek recovery under the Sherman Act.[5] As the House Report states, section 7 "preserves antitrust protections in the domestic marketplace for all purchasers, regardless of nationality or the situs of the business ....." House Report at 10, *reprinted in* 1982 U.S.Code Cong. & Ad.News at 2495.

In the case at bar, plaintiff fails to allege in its complaint any effect on United States trade or commerce resulting from defendants' alleged conduct. Plaintiff merely alleges that the effects of defendants' activities have been to: (1) create artificially high and inflated prices for Vibramycin (the complaint does not specify *where* prices have been inflated); (2) restrict distribution of Vibramycin to defendants and those selected by defendants; (3) prevent pharmaceutical wholesalers, jobbers and distributors from selling to customers of their choice; and (4) exclude wholesalers, jobbers and distributors from the sale of Vibramycin in interstate and foreign commerce. Moreover, it is apparent from plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss that even if plaintiff were given an opportunity to amend its complaint, it would be unable to allege the requisite effects on United States trade or commerce.

Plaintiff concedes in its memorandum that defendants' conduct lacks a direct, substantial and reasonably foreseeable effect on either import commerce into the United States or export commerce from the United States. Plaintiff argues, however, that defendants' activities have had a spillover effect on domestic commerce within the United States. Plaintiff characterizes defendants' conduct as a worldwide cartel directed by Pfizer, Inc. from the United States to ensure that prices for Vibramycin remained at or increased to monopolistic levels after the patent for the drug had expired. Plaintiff claims that this worldwide price-fixing and market allocation conspiracy had the direct, substantial and reasonably foreseeable effect of artificially inflating the price of Vibramycin in the United States. According to plaintiff, from 1981 to 1983 the price for 500 capsules of 100 milligrams of Vibramycin rose from $343.95 to $550.64, representing more than a 38% increase when drug prices during the same period rose only 15%. In addition, plaintiff maintains that due to the expiration in 1982 of defendants' patent on Vibramycin, the price should have declined, not have increased.

Even assuming the truth of plaintiff's allegations that the United States price of Vibramycin has risen since the expiration

---

4. The objective nature of this test is evident from the use of "reasonably" and "foreseeable". The test is whether the effect would have been evident to a reasonable person making practical business judgments, not whether actual knowledge or intent can be shown. House Report at 9, *reprinted in* 1982 U.S.Code Cong. & Ad.News at 2494.

5. Where the conduct is solely export oriented, only domestic exporters (injured in the United States) have a remedy under the Sherman Act. "But a foreign firm whose non-domestic operations were injured by the very same export oriented conduct, would have no remedy under our antitrust laws." House Report at 11, U.S. Code Cong. & Ad.News at 2496.

of defendants' patent, plaintiff has failed to allege any facts demonstrating a causal connection between defendants' conduct in Europe and the price increase in the United States. Plaintiff has not and apparently cannot allege [6] that defendants' conduct has prevented the import of foreign manufactured Vibramycin into the United States or prevented United States companies other than Pfizer, Inc. from manufacturing and selling the drug in the United States. Indeed, plaintiff has made no allegations whatsoever regarding the manufacture, sale or marketing of Vibramycin in the United States other than its allegation that the United States price has increased. Thus the link between defendants' conduct abroad and the price of Vibramycin in the United States is far from apparent.

Plaintiff has utterly failed to establish that defendants' alleged foreign price-fixing and market allocation scheme resulted in an anticompetitive effect on United States domestic or import commerce. This is precisely the type of case Congress sought to eliminate from United States antitrust jurisdiction when it amended the Sherman Act in 1982 to "more clearly establish when antitrust liability attaches to international business activities." House Report at 7, *reprinted in* 1982 U.S.Code Cong. & Ad.News at 2492 (remarks of Chairman Rodino). Accordingly, this Court grants defendants' motion to dismiss for lack of subject matter jurisdiction.

IT IS SO ORDERED.

---

**6.** After defendants filed their motion to dismiss, plaintiff was on full notice of the issues involved. Yet plaintiff's responding memorandum does not contain allegations sufficient to cure the deficiencies in the complaint. It is reasonable to assume that plaintiff has no further facts to allege with respect to the impact of defendants' conduct in the United States.