John L. SNIADO, III, on behalf of himself and all others similarly situated, Plaintiff,

v.

BANK AUSTRIA AG, Raiffeisen Zentralbank Österreich AG, Erste Bank Der Österreichisechen Sparkassen AG, Bank Für Arbeit Und Wirtschaft AG, Österreichische Postsparkasse, Raiffeisenlandesbank Northern Austria–Vienna, Northern Austria Landesbank–Hypothekenbank, Österreichische Volksbanken AG, ABN AMRO Bank N.V., GWK Bank N.V., Fortis N.V., ING Bank N.V., Banca Di Roma SpA, Banca Nazionale Del Lavoro SpA, Banca Intesa, Deutsche Bank AG, and Unicredito Italiano SpA, Defendants.

No. 00 Civ. 9123(AGS).

United States District Court,
S.D. New York.

Nov. 30, 2001.

See, also, 2001 WL 812236.

Bernard Persky, Brbara J. Hart, Goodkind, Labaton, Rudoff & Sucharow LLP, New York City, for Plaintiff.

John H. Shenefield, Jonathan M. Rich, Gregory P. Asciolla, John F. Terzaken, II, Morgan, Lewis & Bockius LLP, Washington, DC, John D. Gordan III, Morgan, Lewis & Bockius LLP, New York City, for Bank Austria AG.

Paul A. Engelmayer, Wilmer, Cutler & Pickering, Washington, DC, James W. Lowe, Wilmer, Cutler & Pickering, Washington, DC, for Raiffeisen Zentralbank Osterreich AG, Raiffeisenlandesbank Northern Austria-Vienna AG, Northern Austria Landesbank-Hypothekenbank AG, and Osterreichische Volksbanjen AG.

Allen M. Unger, James D. Arden, Sidley, Austin, Brown & Wood, New York City, for Erste Bank der oesterreichischen Sparkassen AG.

Dennis P. Orr, Hector Gonzalez, Mayer, Brown & Platt, New York City, Steven R. Gilford (of counsel), Chicago, IL, for ABN AMRO Bank N.Y. Inc.

Robert A. Horowitz, Karen Y. Bitar, Greenberg & Traurig, New York City, for Fortis N.V. and GWK Bank N.V.

Jerome S. Fortinsky, Brian H. Polovoy, Shearman & Sterling, New York City, for ING Bank N.V.

Michael S. Shuster, White & Case LLP, New York City, for Banca di Roma SpA.

Gordon B. Nash, Jr., Gardner, Carton & Douglas, Chicago, IL, for Banca Nazionale del Lavoro SpA.

Richard A. Martin, Kevin J. Toner, Heller, Ehrman, White & McAuliffe, New York City, for IntesaBci, SpA.

Jeffrey Barist, Brian D. Hail, Milbank, Tweed, Hadley & McCloy, New York City, for Deutsche Bank AG.

Richard L. Mattiaccio, Pavia & Harcourt, New York City, for Unicredito Italiano SpA.

## MEMORANDUM ORDER

SCHWARTZ, District Judge.

In this antitrust action, plaintiff alleges that defendants conspired to fix the fees charged for exchanging one European currency for another European currency. Plaintiff seeks to represent a class of American individuals and businesses who paid supra-competitive fees for exchanging currencies that make up the Euro. Defendants move to dismiss the amended complaint for lack of subject matter jurisdiction, pursuant to Fed.R.Civ.P. 12(b)(1), and for failure to state a claim, pursuant to Fed.R.Civ.P. 12(b)(6). Defendants also contend in their motions that plaintiff's claims are partially time-barred. For the reasons set forth below, defendants' motions to dismiss the action for lack of sub-

ject matter jurisdiction are granted; the Court does not reach the other issues.

## I. BACKGROUND

Plaintiff John L. Sniado, III is an individual who lives in New York State. (Amended Class Action Complaint for Violation of Federal Antitrust Laws ("Am. Compl.") ¶ 5.) He "paid foreign exchange fees to defendants when exchanging certain of the currencies that make up the Euro during the relevant period and has been damaged ... by paying supra-competitive fees for such transactions." (Id.) No further information about Mr. Sniado's transaction or transactions is provided. During proceedings in this action on April 5, 2001, however, plaintiff's counsel represented to the Court that Mr. Sniado had exchanged currency in Europe but not in the United States.

The defendants are European banks, some of whom are alleged to have offices in the United States. (Am.Compl.¶¶ 6–22.) Defendants Bank Austria AG ("Bank Austria"), Erste Bank der Österreichisechen Sparkassen AG ("Erste Bank"), Raiffeisen Zentralbank Österreich AG ("Raiffeisen"), Bank für Arbeit und Wirtschaft AG and Österreichische Postsparkasse (together "BAWAG"), Raiffeisenlandesbank Northern Austria–Vienna ("Raiffeisenlandesbank"), Northern Austria Landesbank–Hypothekenbank ("Northern Austria Landesbank"), and Österreichische Volksbanken AG ("Österreichische") are all Austrian banks. (Id. ¶¶ 6–12.) Defendants ABN AMRO Bank, N.V. ("ABN Amro"), ING Bank N.V. ("ING"), GWK Bank N.V. ("GWK") and Fortis N.V. ("Fortis") are all Dutch banks. (Id. ¶¶ 13–16.) Defendants Banca Intesa SpA ("BI"), Banca di Roma SpA ("BDR"), Banca Nazionale del Lavoro SpA ("BNL"), UniCredito Italiano SpA ("Unicredito"), and Sanpaolo IMI SpA ("Sanpaolo") are all Italian banks. (Id.

¶¶ 17–21.) Defendant Deutsche Bank Aktiengesellschaft ("Deutsche Bank") is a German bank. (*Id.* ¶ 22.) Collectively, defendants have "exchanged millions of dollars of European currency in the United States and in Europe" in exchange for certain fees. (*Id.* ¶ 33.)

In April 1997, the head of an Austrian bank not named in this action committed suicide. His suicide note asserted that the Austrian banks, known collectively as the "Lombard Club," had engaged in price fixing and other illegal activities. (*Id.* ¶¶ 39–40.) The next month, Austrian journalists reported that Austrian banks had discussed certain measures to improve their profitability. (*Id.* ¶ 41.) The suicide note and the media story led to an investigation by the European Commission (the "EC"), which raided several of the Austrian banks and seized documents. (*Id.* ¶¶ 42–43.) The EC subsequently accused the Austrian banks of fixing exchange fees for currencies that make up the Euro. According to the EC, the Lombard Club had been meeting for decades to discuss setting currency exchange fees. (*Id.* ¶¶ 44–47.) In September 1999, the EC sent "statements of objections" (a/k/a "warnings") to eight Austrian banks, including the seven Austrian defendants here. The warnings allegedly contained documentary evidence of the fixing of currency exchange fees. (*Id.* ¶ 48.) In November 2000, the EC issued supplementary warnings to the members of the Lombard Club. (*Id.* ¶ 62.)

In February 1999, the EC raided certain banks in Germany, France, Spain, and Italy based on evidence that large European banks had been fixing currency exchange fees. Among the banks raided was defendant Deutsche Bank. (*Id.* ¶ 50.) In October 1999, the EC raided certain banks in Ireland, Belgium, and the Netherlands.

Among the banks raided were defendants ABN AMRO, Fortis, GWK, and a subsidiary of defendant ING. (*Id.* ¶ 51.) The EC also issued over 250 letters demanding information regarding the fixing of currency exchange fees. (*Id.* ¶ 52.) In June 2000, EC officials stated that they had uncovered evidence of price-fixing among European banks. That same month, the EC disclosed that approximately 120 banks in Ireland, Portugal, Finland, and Belgium were under investigation for fixing currency exchange fees and had been issued warnings regarding such conduct. The EC claims to have documentary evidence that certain banks, including ABN AMRO branches in Belgium and Portugal and the Deutsche Bank branch in Belgium, fixed currency exchange fees. (*Id.* ¶¶ 57–58.) In July 2000, the EC publicly stated that it had enough evidence to demonstrate that the 120 banks in Ireland, Portugal, Finland, and Belgium had violated European Union rules concerning competition. (*Id.* ¶ 59.) In August 2000, the EC issued warnings to seventeen German banks, thirteen Dutch banks, and two Dutch banking associations. The warnings stated that the EC had evidence of currency exchange fee fixing, in violation of European Union competition rules. Defendants Fortis, GWK, ABN AMRO and ING were among those receiving warnings. (*Id.* ¶ 61.) In November 2000, the EC held closed hearings concerning Finnish, Irish, Portugese, and Belgian banks. (*Id.* ¶ 69.) In April 2001, the EC ended its investigation of Dutch bank SNS Bank (which is not named in this action) after SNS Bank agreed to abolish its minimum foreign currency exchange fee. (*Id.* ¶ 71.)

In April 1999, Italy's central bank, the Bank of Italy, began to investigate a group known as "The Friends of the Bank Group," which included certain Italian banks and Deutsche Bank. The group allegedly met from March 1997 through Jan-

uary 1999 and agreed to fix currency exchange fees, among other things. (*Id.* ¶ 64.) In January 2000, the Bank of Italy fined thirteen banks a total of 33,000,000,-000 Italian Lira (equaling approximately $17,250,000). According to the Bank of Italy, the banks had operated an illegal cartel since 1988 and had jointly set currency exchange fees. The fined banks had allegedly raised 1,000,000,000,000 Italian Lira over the previous ten years through their various unlawful activities. Among the banks fined were defendants Deutsche Bank, BDR, BNL, Sanpaolo, and Unicredito, and the predecessors of defendant BI. (*Id.* ¶¶ 66–68.)

Plaintiff filed this action on November 30, 2000. In March 2001, certain defendants moved to dismiss the complaint. During proceedings before the Court on April 5, 2001, plaintiff announced his desire to amend the complaint. With the consent of the parties in attendance (not all defendants having been served by that time), the motion to dismiss was withdrawn without prejudice, plaintiff was granted leave to file an amended complaint, and a schedule was set for a motion to dismiss the amended complaint. *See* Order dated April 5, 2001. Plaintiff filed his amended complaint in April 2001. The defendants that had been served then jointly moved to dismiss the amended complaint. Subsequently, those defendants who were later served also filed motions to dismiss, which motions adopted the arguments of the earlier joint motion. In addition to opposing the motions to dismiss, plaintiff filed a motion seeking leave to conduct discovery relating to subject matter jurisdiction. The Court denied that motion, concluding that defendants' motions make a facial, not factual, challenge to the amended complaint.[1] *See* Memorandum Order dated July 18, 2001, 2001 WL 812236. Briefing of the motions to dismiss was completed in August 2001.[2] The Court heard oral argument on October 11, 2001.

## II. MOTION TO DISMISS STANDARD

A court may not dismiss a complaint pursuant to Rule 12 unless, even when the complaint is liberally construed, it appears beyond doubt that the plaintiff can prove no set of facts which would entitle it to relief. *Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir.1997). On a motion to dismiss, a court must accept as true all of the facts alleged in the complaint. *Id.* A court must also must draw all reasonable inferences in the light most favorable to the plaintiff. *Id.* In antitrust cases, as in other types of cases, all that is required is a "short plain statement of a claim for relief which gives notice to the opposing party." *Global Disc. Travel Servs. v. Trans World Airlines,* 960 F.Supp. 701 (S.D.N.Y.1997) (Sotomayor, J.). "This does not mean that 'conclusory allegations which merely recite the litany of antitrust ... will suffice.'" *Id.* (quoting *John's Insulation, Inc. v. Siska Constr. Co.,* 774 F.Supp. 156, 163 (S.D.N.Y.1991)).

Although plaintiff Sniado purports to represent a class of plaintiffs, the action is not now treated as a class action because

---

1. As these motions have been determined to make a facial challenge to the amended complaint, material outside the amended complaint, specifically the Affidavit of Bernard Persky in Opposition to Defendants' Joint Motion to Dismiss dated July 13, 2001, is hereby excluded from consideration.

2. Briefing was completed as to the motions to dismiss for lack of subject matter jurisdiction and for failure to state a claim. Certain defendants also moved to dismiss for lack of personal jurisdiction; the Court granted those defendants permission to postpone briefing of that issue until after resolution of the other issues.

no class has yet been certified. *See In re Painewebber Limited P'ships Litig.*, 147 F.3d 132, 137 (2d Cir.1998) (citing *Baxter v. Palmigiano*, 425 U.S. 308, 310–11 n. 1, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *Board of Sch. Comm'rs v. Jacobs*, 420 U.S. 128, 129–30, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975)). Until and unless a class is certified, the Court must treat this action as an individual action by plaintiff Sniado.

## III. DISCUSSION

■ The initial question here is whether the Court has subject matter jurisdiction over plaintiff's claim pursuant to the Foreign Trade Antitrust Improvements Act of 1982 (the "FTAIA"), 15 U.S.C. § 6a. The answer is no.

The FTAIA provides that:

Sections 1 to 7 of this title shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless-

(1) such conduct has a direct, substantial, and reasonably foreseeable effect-

(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

(2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

If sections 1 to 7 of this title apply to such conduct only because of the operation of paragraph (1)(B), then sections 1 to 7 of this title shall apply to such conduct only for injury to export business in the United States.

15 U.S.C. § 6a. The parties appear to agree that neither import nor export commerce are at issue here. Accordingly, the FTAIA issues presented are: (1) whether the alleged conduct by defendants has a "direct, substantial, and reasonably foreseeable" effect on domestic American commerce and (2) whether such effect is anticompetitive and gives rise to plaintiff's claim.

### A. Section 6a(1)

With regard to the first question, defendants contend that plaintiff has not alleged any direct, substantial, or reasonably foreseeable effect on domestic American commerce. (Defs.' Joint Mem. of Law in Supp. of their Mot. to Dismiss the Am. Class Action Compl. Pursuant to Rules 12(b)(1) and 12(b)(6) of the Fed.R.Civ.P. ("Defs.' Mem.") at 10–12; Defs.' Joint Mem. of Law in Reply to Pl.'s Opp. to Defs.' Mot to Dismiss ("Reply Mem.") at 2–10.) Plaintiff asserts that he alleges just such an effect. (Pl.'s Mem. of Law in Opp. to Defs.' Joint Mot. to Dismiss ("Pl.'s Mem.") at 11–23.) Plaintiff does allege that he was damaged by "defendants' conduct in violation of the federal antitrust law[s] as complained of herein which had a direct, substantial, and reasonably foreseeable effect on United States commerce by raising exchange fees to plaintiff...." (Am.Compl.¶ 26.) However, this is merely a conclusory recitation of the antitrust litany and, accordingly, is insufficient.

In terms of facts, plaintiff does allege that defendants exchange currency "in the United States and Europe and received fees [for such exchanges]...." (Am. Compl.¶ 33.) Plaintiff also alleges that "defendants conspired, contracted or combined with themselves and others for the purpose and with the effect of raising, fixing, and stabilizing the fees paid by plaintiff ... for [his] exchanges of European currency." (*Id.* ¶ 36.) Plaintiff does not specifically allege that the defendants agreed to fix currency exchange fees for

transactions conducted in the United States. However, on a motion to dismiss, the Court will draw the reasonable inference that the allegedly conspiring defendants agreed to fix currency exchange fees in the United States as well as in Europe.

Drawing such an inference might or might not satisfy the direct and reasonably foreseeable requirements, however. In *Kruman v. Christie's International PLC*, 129 F.Supp.2d 620 (S.D.N.Y.2001), the court noted that the word "conduct" in the FTAIA could be read broadly or narrowly. *Kruman* arose out of allegations that Sotheby's and Christie's, the world's two largest auctioneers of fine arts and antiques, conspired to fix prices. *Id.* at 622–23. The plaintiffs, four of whom were American, each purchased or sold items at auctions conducted by the defendants outside of the United States. Each plaintiff allegedly paid fixed, supra-competitive buyers' premiums or sellers' commissions at those foreign auctions. *Id.* at 623. The court dismissed the action for lack of subject matter jurisdiction under the FTAIA. In considering the FTAIA, the court noted that "conduct" could refer to "the totality of defendants' actions" or to the specific actions that harmed the plaintiffs. *Id.* at 625. The court concluded that the narrow interpretation was correct. *Id.* at 625–26. That interpretation meant that the "conduct" in question was the charging of supra-competitive premiums or commissions at auctions conducted outside of the United States. Accordingly, the court found no direct, substantial, and reasonably foreseeable effect on domestic commerce as a result of the defendants' alleged conduct. *Id.* If the Court were to adopt the *Kruman* interpretation of "conduct," plaintiff would fail to satisfy § 6a(1). Under *Kruman*, the conduct at issue here would be the charging of supra-competitive fees in Europe, as that is the particular conduct that harmed Mr. Sniado. The charging of

supra-competitive fees for exchanges of European currencies in Europe does not have a direct, substantial, or reasonably foreseeable effect on domestic commerce in the United States.

Plaintiff argues that a direct effect on United States commerce requires only that Americans overpay for services abroad. (Pl.'s Mem. at 13–17.) Plaintiff bases this argument upon *Caribbean Broadcasting Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080 (C.A.D.C.1998), and *Galavan Supplements Ltd. v. Archer Daniels Midland Co.*, C 97–3259 FMS, 1997 WL 732498, 1997 U.S. Dist. LEXIS, 18585 (N.D.Cal. Nov. 18, 1997). In *Caribbean Broadcasting*, the plaintiff owned a radio station in "the Eastern Caribbean, which includes Puerto Rico and the Virgin Islands." 148 F.3d at 1082. The defendants were the owner of a competing radio station and a telecommunications company. *Id.* The plaintiff alleged that the defendants had taken various actions that restrained the market for radio advertising, including conspiring to make the defendant radio station a monopoly in the Eastern Caribbean. *Id.* The court found that the plaintiff alleged a direct, substantial and reasonably foreseeable effect upon domestic commerce. The court noted that the plaintiff alleged "that there is a significant market for the sale of English-language radio advertising in the Eastern Caribbean, which includes Puerto Rico and the U.S. Virgin Islands. [The plaintiff] also allege[d] ... that many companies based in the United States are customers, and that [the defendant] and [the plaintiff] are competing sellers, in that market." *Id.* at 1086. To the extent that the finding of a direct effect arises from a market including American territory, *Caribbean Broadcasting* is distinguishable from this case. To the extent that *Caribbean Broadcasting* relies upon the fact that United States

customers were engaging in transactions abroad, that decision conflicts with a decision from this District, *McElderry v. Cathay Pacific Airways, Ltd.,* 678 F.Supp. 1071 (S.D.N.Y.1988). McElderry alleged that Cathay Pacific had conspired with other airlines to adopt excessive baggage charges on flights entirely outside the United States. The court found that there was no subject matter jurisdiction under the FTAIA because there was no direct, substantial, and reasonably foreseeable effect on United States commerce. As the Court stated:

> First, even accepting, for the purposes of this motion to dismiss, McElderry's contention that thousands of American passengers have been overcharged for their baggage by Cathay Pacific, an allegation of mere monetary injury is not enough to state a Sherman Act claim: a Sherman Act plaintiff must show injury to a market or to competition in general, not merely injury to individuals.

678 F.Supp. at 1078; *see also* H.R. Rep. No 97–686, at 9–10 (foreign transaction does not fall within American antitrust law solely because of American ownership of transacting parties). To the extent that *McElderry* and *Caribbean Broadcasting* conflict, the former presents the better argument for purposes of this action.

As for *Galavan,* that case declines to follow an earlier case from this District, *Eurim–Pharm v. Pfizer, Inc.,* 593 F.Supp. 1102 (S.D.N.Y.1984). In *Eurim–Pharm,* plaintiffs admitted that the defendants' conduct did not have a direct, substantial, and reasonably foreseeable effect on import or export commerce, but maintained that the defendants' conduct had a "spillover effect" on domestic commerce. *Id.* at 1106. The Court, apparently relying upon the text of § 6a, held that the plaintiffs had failed to establish subject matter jurisdiction. *Id.* at 1106–07. *Galavan* attempts to distinguish *Eurim–Pharm* on the basis that the *Galavan* plaintiffs had alleged an effect on imports. 1997 WL 732498, 1997 U.S. Dist. LEXIS 18585, at*7. The *Galavan* Court then relied upon legislative history to find that spillover effects were sufficient. *Id.* 1997 WL 732498, at *8. To the extent *Galavan* is distinguishable from *Eurim–Pharm* based on an allegation of effects on import commerce, *Galavan* is also distinguishable from the instant action. To the extent *Galavan* relies upon legislative history, *Eurim–Pharm'*s reliance on statutory text is more persuasive. Thus, *Galavan* does not support a finding that plaintiff alleged a direct or reasonably foreseeable effect on United States commerce if the Court were to adopt the narrow interpretation of "conduct." (Although *Galavan* found that the court had subject matter jurisdiction, it dismissed the action because plaintiffs lacked standing due to their lack of participation in a domestic American market. 1997 WL 732498, 1997 U.S. Dist. LEXIS 18585, at 10–*13. If the Court were to follow *Galavan,* then, it would still dismiss this action.) Accordingly, if the Court were to adopt the narrow interpretation of conduct advanced by *Kruman,* dismissal for lack of subject matter jurisdiction would be required. The Court need not choose a definition of "conduct" in § 6a(1), however, because dismissal is required under § 6a(2), as set forth below.

If the Court were to adopt the broader interpretation of "conduct," plaintiff would have alleged conduct that directly and reasonably foreseeably affected domestic commerce in the United States. Under the broader interpretation, the conduct in question would consist of the entire alleged conspiracy to fix fees for exchanges of European currencies in Europe and the United States. Fixing the fees charged for exchanges of European currencies that take place in the United States would di-

rectly restrain the American market for European currency exchanges. And such a restraint would be the reasonably foreseeable effect of an agreement to fix the fees.

If a direct and reasonably foreseeable effect on United States commerce is alleged, there remains the question of whether such effect is substantial. Neither party adequately addresses this issue. Defendants simply take the position that there was no direct effect on United States commerce, and do not address the substantiality issue. (Defs.' Mem. at 9–15; Reply Mem. at 2–10.) Plaintiff relies on several cases that antedate the FTAIA for the proposition that the effect on United States commerce need only be more than *de minimus*. (Pl.'s Mem. at 17–18.) This proposition must be rejected, as the text of § 6a clearly requires that the effect be "substantial." The Court is not aware of any case that is directly on point; cases either find no direct effect on American commerce or assume that the effect is substantial. Absent convincing indications to the contrary, the Court will assume that the effect, if direct and reasonably foreseeable, would be substantial. The Court makes such assumption because it believes that plaintiff's claim fails on the second prong of the FTAIA test, even if the Court were to adopt the broader interpretation of "conduct."

### B. Section 6a(2)

As noted above, subsection (2) requires that, "such [direct, substantial, and reasonably foreseeable] effect [on United States commerce] gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section." It is clear from the text that this subsection requires the effect to be an anticompetitive effect. Any claim under the first seven sections of Title 15 requires an anticompetitive effect,

a restraint of trade. · 15 U.S.C. §§ 1–7; *see also* H.R.Rep. No. 97–686, at 11–12, 18 (1982) (discussing § 6a(2)'s requirement of anticompetitive effects). If there is a direct, substantial, and reasonably foreseeable effect on domestic American commerce here, it is an anticompetitive effect: the fixing of fees charged for exchanges of European currencies.

The parties disagree as to whether plaintiff's claim must arise out of this anticompetitive effect on domestic American commerce. Defendants argue that plaintiff does not comply with § 6a(2) because, even assuming he alleges the requisite effect on American commerce, plaintiff does not allege that such effect gives rise to *his* claim. (Defs.' Mem. at 13–15; Reply Mem. at 10–11.) Plaintiff argues that the effect need not give rise to his claim, but only to a claim. (Pl.'s Mem. at 15.) The weight of authority clearly supports defendants. *See Den Norske Stats Oljeselskap As v. HeereMac Vof,* 241 F.3d 420 (5th Cir.2001), *petition for cert. filed,* 69 U.S.L.W. 3791 (June 11, 2001); *Ferromin Int'l Trade Corp. v. UCAR Int'l, Inc.,* 153 F.Supp.2d 700 (E.D.Pa.2001); *Turicentro, S.A. v. American Airlines, Inc.,* 152 F.Supp.2d 829 (E.D.Penn.2001); *Empagran S.A. v. F. Hoffman–La Roche, Ltd.,* No. Civ. 001686TFH, 2001 WL 761360 (D.D.C. June 7, 2001); *United Phosphorus, Ltd. v. Angus Chem. Co.,* 131 F.Supp.2d 1003 (N.D.Ill.2001); *Kruman v. Christie's Int'l PLC,* 129 F.Supp.2d 620 (S.D.N.Y.2001); *In re Copper Antitrust Litig.,* 117 F.Supp.2d 875 (W.D.Wis.2000); *cf. In re Microsoft Corp. Antitrust Litig.,* 127 F.Supp.2d 702 (D.Md.2001). *But see Den Norske,* 241 F.3d at 431–39 (Higginbotham, J., dissenting). Because the Court finds the majority position convincing, the Court grants a dismissal based on § 6a(2).

In *Den Norske,* a Norwegian oil company brought an antitrust suit in the United States District Court for the Southern District of Texas against several companies, one of which was American. The defendants were the world's sole operators of certain machinery required to build and move oil platforms. The plaintiff alleged that the defendants engaged in a bid rigging conspiracy and allocated customers among themselves. 241 F.3d at 421–22. The conspiracy was allegedly global in scope, and allegedly resulted in purchasers of the defendants' services in the Gulf of Mexico (i.e. in American waters) paying inflated prices. *Id.* at 422. The district court dismissed the action under the FTAIA and the plaintiff appealed. The Fifth Circuit majority affirmed based, at least in part, on § 6a(2). The court noted that

> [t]he dissent, like [the plaintiff], argues that Section 2 should be read to require only that the domestic effect give rise to *any* antitrust claim, not necessarily the plaintiff's claim. This interpretation contradicts the explicit intent of Congress to require that the effect must give rise to the particular injury claimed by the plaintiff in the suit:
>
> > ... [T]he full committee added language to the Sherman and FTC Act amendments to require that the 'effect' providing the jurisdictional nexus *must also be the basis for the injury alleged under the antitrust laws.*
>
> H.R.Rep. No. 97–686, at 12 (emphasis added).

241 F.3d at 426 n. 19 (emphasis in the original). Because inflated prices paid by American companies for defendants' services in the Gulf of Mexico did not give rise to the plaintiff's claim for inflated prices paid for defendants' services in the North Sea, the district court lacked subject matter jurisdiction over the action.

*Id.* at 427. Although the court recognized the relationship between the inflated prices in the two locations, "the FTAIA requires more than a 'close relationship' between the domestic injury and the plaintiff's claim; it demands that the domestic effect 'gives rise' to the claim." *Id.*

A similar result was reached in *In re Copper Antitrust Litigation.* In that action, plaintiffs who had purchased copper futures on the London Metal Exchange sued the defendants for an alleged conspiracy to manipulate the London Metal Exchange in order to artificially inflate the price of copper. 117 F.Supp.2d at 876. The court found that there was a direct, substantial, and reasonably foreseeable effect on the United States copper market. *Id.* at 879. However, the district court found that subsection (2) of the FTAIA was not satisfied. The court asserted that the "most natural way of reading [section 6a] is that antitrust laws do not apply unless the effects are the same. In other words, the Sherman Act claim that a plaintiff alleges and the Sherman Act claim that arises out of the effect on an American market must be the same." *Id.* at 882 (emphasis in the original). The court expressly rejected plaintiff's argument that the effect on United States commerce need only give rise to *some* claim. The court also rejected the argument advanced by plaintiff (and later by the *Den Norske* dissent) that requiring that plaintiff's claim arise out of the effect on American commerce would make the final proviso of § 6 redundant. *Id.* at 884. The court then considered the legislative history of the FTAIA, concluding that "[n]othing in this history suggests that Congress intended that the scope of recovery would extend to persons injured overseas by effects other than those felt by American markets." *Id.* at 885.

Plaintiff contends (and the court in *In re Microsoft Corp. Antitrust Litigation* asserted, 127 F.Supp.2d at 716) that the holding in *In re Copper* depended upon the fact that the plaintiffs there had purchased copper futures, whereas the effect on domestic commerce was the inflation of prices on the American market for copper itself. The Court believes that this is a misreading, and that *In re Copper* and *Den Norske* (in which both the domestic and foreign markets for "heavy-lift barges" were affected) are consistent on this point. First, the *In re Copper* Court never stated that its holding depended on any such distinction. Second, the language quoted above is inconsistent with such a position. The court did not state that the effects suffered by the plaintiff and the effects on the United States market needed to be parallel; it stated that those two effects needed to be one and the same. Consider also the following passage:

> Defendants do not dispute the assertion that Congress intended to preserve Sherman Act jurisdiction for a foreign person injured by conduct that causes the requisite effects in the United States, even if that person suffers economic injury abroad, so long as the overseas injury is the result of *effects on an American market.* If persons conspire to fix prices in a way intended to affect an American market, the domestic antitrust laws will apply to a suit by a person injured by the price-fixing even if the person is located overseas. *On the other hand, the antitrust laws do not apply to an action by a person injured overseas because of price-fixing in a foreign market even if the same defendants engage in price-fixing affecting an American market.*

*Id.* at 885 (emphasis added).

The other cases cited by defendants employ reasoning similar to *Den Norske* and *In re Copper* to arrive at the same result. For example, in *Kruman* the court ruled that "the FTAIA permits suit … only where the conduct complained of had 'direct, substantial and reasonably foreseeable effects' in the United States and the effects giving rise to jurisdiction also are the basis for the alleged injury." 129 F.Supp.2d at 625 (footnote omitted). The court observed in a footnote that the legislative history "make[s] clear that purchasers in entirely foreign transactions who do not suffer from any lessening of competition within, the United States have no claim." *Id.* at 625 n. 15. Plaintiff criticizes *Kruman* as improperly relying on issues of market definition and market power even though the plaintiffs alleged a *per se* violation. (Pl.'s Mem. at 21–22.) The Court does not agree that the *Kruman* decision relies upon issues of market definition and market power, except to the extent that *Kruman* relies upon the FTAIA's distinction between American markets and foreign markets.

In *Ferromin,* the court dismissed a complaint alleging a global conspiracy to fix the price of graphite electrodes because the plaintiffs had purchased electrodes only outside the United States. The court concluded, based on the text of the FTAIA and the cases construing it, that to establish subject matter jurisdiction under the FTAIA a plaintiff must show that its injuries were caused by an anticompetitive effect on a United States market. 153 F.Supp.2d at 703–06. *Accord Turicentro,* 152 F.Supp.2d at 833 ("plain language" of FTAIA requires that plaintiff's injury arise from effects on domestic market; controlling issue is where the effects of defendant's conduct are felt); *Empagran,* 2001 WL 761360, at*2–*3 (ruling that "the effect providing the jurisdictional nexus must also be the basis for the injury alleged under the antitrust laws" and dis-

missing action where plaintiffs did not purchase in the domestic market; allegation of global conspiracy held insufficient to establish jurisdiction); *United Phosphorus*, 131 F.Supp.2d at 1009, 1013–14, 1018–20 (no subject matter where, among other things, plaintiffs' injury did not arise out of effects on domestic market).

In *In re Microsoft*, after considering the language and legislative history of the FTAIA, the court concluded that, "[t]he critical question is not the nationality of the plaintiff but the location of the marketplace in which he participated." 127 F.Supp.2d at 716. Later the court altered course and stated that, "section 6a itself does not tie subject matter jurisdiction to the situs of the market in which the plaintiff participated." *Id.* Then, citing *Galavan*, the court dismissed for lack of standing. *Id.* The court concluded its discussion of the issue by stating that, "[i]n any event, whether the issue is resolved as one of jurisdiction or one of standing, the result is the same. I hold that a plaintiff who has not participated in the U.S. domestic market may not bring a Sherman Act claim under the FTAIA." *Id.* The Court agrees with the ultimate conclusion of the *In re Microsoft* court to the effect that the key jurisdictional issue under § 6a(2) is whether a plaintiff participated in the affected American market.

In opposition to the majority position, plaintiff relies upon the *Den Norske* dissent, which is not persuasive, and upon cases that are inapposite. For example, plaintiff relies upon *Caribbean Broadcasting*, a case which did not acknowledge the existence of subsection (2). 148 F.3d at 1085–87; *see also In re Copper Antitrust Litigation*, 117 F.Supp.2d at 875 (distinguishing *Caribbean Broadcasting* based on its ignoring subsection (2).) Plaintiff also relies upon *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993), and *Pfizer, Inc. v. India*, 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978). In *Hartford Fire*, plaintiffs sued insurers and reinsurers located in the United States and abroad over an alleged conspiracy "to restrict the terms of coverage of commercial general liability (CGL) insurance available in the United States." 509 U.S. at 770, 113 S.Ct. 2891 (footnotes omitted). The plaintiffs were thus alleging that their injuries arose out of a restraint on domestic commerce; subsection (2) was obviously satisfied. *See id.* at 770–779, 113 S.Ct. 2891. Moreover, the Supreme Court chose not to confront any FTAIA issues, opting instead to simply assume that the statute was satisfied. *Id .* at 796 n. 23, 113 S.Ct. 2891. As for *Pfizer*, that case predates the FTAIA by four years. It cannot be relied upon as authority for interpreting § 6a. In addition, the principal question in *Pfizer* was whether foreign nations were "persons" within the meaning of 15 U.S.C. § 15, 434 U.S. at 311, 98 S.Ct. 584, and the Supreme Court held "only that a foreign nation otherwise entitled to sue in our courts is entitled to sue for treble damages under the antitrust laws to the same extent as any other plaintiff." *Id.* at 320, 98 S.Ct. 584. Furthermore, the foreign governments in *Pfizer* apparently participated in the domestic American markets. *See* 434 U.S. at 590, 98 S.Ct. 873 ("When a foreign nation enters our commercial markets as a purchaser of goods ..."); *see also* H.R. Rep. 97–686, at 10 (citing *Pfizer* for the proposition that "[f]oreign purchasers should enjoy the protection of our antitrust laws in the domestic marketplace" even if they feel abroad the injurious effects of a domestic restraint of trade). Accordingly, *Pfizer* is distinguishable from this action.

Plaintiff also directs the Court's attention to *In re Vitamins Antitrust Litigation*, No. 99–197TFH, 2001 WL 755852 (D.D.C. June 7, 2001). (Letter from Bar-

bara J. Hart to the Court dated July 24, 2001.) In that action, the court denied a motion to dismiss under the FTAIA because the plaintiffs had made purchases in the domestic American market and because the plaintiffs were subsidiaries of American companies. 2001 WL 755852, at *2. That action is distinguishable to the extent that the plaintiffs therein made purchases in the domestic American market. To the extent the court's holding relied upon an effect on the finances of the plaintiffs' American parent companies, this Court respectfully takes a different view than that of the *In re Vitamins* court. *See* H.R. Rep. 97–686, at 9–10 (stating that a transaction between foreign firms is not within the scope of American antitrust laws merely because the foreign firms are American-owned; requirements of § 6a must be met for American law to apply).

 After consideration of the FTAIA, the legislative history of the FTAIA, and the cases construing the statute and its legislative history, the Court finds plaintiff's argument unpersuasive, and adopts the majority interpretation of subsection (2) for the reasons set forth in the majority cases. Whether or not the Court considers the statement by plaintiff's counsel that plaintiff only exchanged currency in Europe, the majority interpretation of subsection (2) requires dismissal. Under that interpretation, plaintiff must allege that his claim, his injury, arose out of a direct, substantial, and reasonably foreseeable anticompetitive effect on domestic American commerce (import and export commerce being irrelevant to this action). Plaintiff does not, and apparently cannot, allege that his claim arose out of any effect on domestic American commerce. Accordingly, plaintiff fails to satisfy subsection (2) of 15 U.S.C. § 6a, and so does not meet his burden of demonstrating subject matter jurisdiction. The Court therefore grants defendants' Rule 12(b)(1) motions and dismisses the instant action.

## IV.   CONCLUSION

For the reasons set forth above, the defendants' motions to dismiss for lack of subject matter jurisdiction are granted. Accordingly, defendants' motions to dismiss for failure to state a claim and for lack of personal jurisdiction are denied, without prejudice, as moot. The Clerk of the Court is directed to close the file in this action.

SO ORDERED.